## CHARLES DODGE AND CHRISTINE Y. ROBERTS, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9830-87.      Filed February 12, 1991.

*Eugene G. Sayre* and *Virginia Joyce Kinkead,* for the petitioners.

*Paul M. Kohlhoff,* for the respondent.

SWIFT, *Judge:* Respondent mailed petitioners separate notices of deficiency each dated January 16, 1987, determining deficiencies in and additions to petitioners' respective individual Federal income taxes for 1981, 1982, 1983, and 1984, as follows:

*Charles Dodge*

| Year | Deficiency | Additions to tax | | | | |
| | | Sec.[1] 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6654 | Sec. 6661(a) |
|---|---|---|---|---|---|---|
| 1981 | $14,499.10 | $3,624.78 | $724.96 | * | $1,110.99 | --- |
| 1982 | 23,752.12 | 5,938.03 | 1,187.61 | * | 2,312.48 | $5,938.03 |
| 1983 | 68,072.79 | 17,018.20 | 3,403.64 | * | 4,165.57 | 17,018.20 |
| 1984 | 63,050.44 | 15,762.61 | 3,152.52 | * | 3,964.06 | 15,762.61 |

*Christine Y. Roberts*

| Year | Deficiency | Additions to tax | | |
| | | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec.6661(a) |
|---|---|---|---|---|
| 1981 | $40,975.41 | $2,048.77 | * | --- |
| 1982 | 27,379.15 | 1,368.96 | * | $6,844.79 |
| 1983 | 69,368.84 | 3,468.44 | * | 17,342.21 |
| 1984 | 123,626.95 | 6,181.35 | * | 30,906.74 |

*50 percent of the interest attributable to the portion of the underpayment that is due to negligence or intentional disregard of the rules and regulations.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The primary issues for decision are: (1) Whether under section 104(a)(3) petitioner Charles Dodge (Dodge) may exclude from income proceeds received under an insurance speculation scheme; (2) whether deposits to petitioners' bank accounts during the years at issue represent unreported income to either petitioner; (3) whether petitioners are entitled to certain interest deductions under section 163(a); and (4) whether petitioners are liable for the various additions to tax determined in their respective notices of deficiency.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in Mountain Home, Arkansas, at the time they filed their joint petition.

Following his discharge from the military in 1955, petitioner Charles Dodge worked at numerous jobs in various States. He worked as a diesel mechanic, as an insurance salesman, and as a minister. He also worked on the family farm, and he promoted tax shelters.

Dodge married and raised a family. In the mid-sixties, Dodge was diagnosed as having spinal meningitis, and he was hospitalized in a Veterans' hospital in Dallas, Texas. Because of the illness, Dodge now suffers partial facial paralysis and a partial hearing loss. Dodge receives Veterans' disability benefits as a result of this illness. On February 9, 1979, Dodge's wife died from a brain aneurysm.

As a result of two earlier cases involving Dodge and Dodge's failure to properly file Federal income tax returns for a number of years, including the years at issue herein, Dodge has been identified on respondent's records as a tax protester. Dodge was convicted in 1976 of eight counts of violating section 7205, and eight counts of violating 18 U.S.C. section 2 (1988). With respect to the convictions, Dodge served eight concurrent 1-year prison terms.

In a previous case before this Court, involving unreported income and respondent's deficiency determinations based on the bank deposits method of proof, Dodge was warned that the filing of further frivolous or unwarranted cases could result in the imposition of a penalty under section 6673. *Dodge v. Commissioner,* T.C. Memo. 1983-431. At issue in

that case was Dodge's unreported income from speaking at tax protester meetings and from selling tax protester material.

Prior to her association with Dodge, petitioner Christine Roberts (Roberts) acquired various houses, resort and rental properties in Arkansas and Texas, fur coats, diamond jewelry, and bank accounts. Each year Roberts also received pension benefits from Braniff Airways and oil royalties from Scurlock Oil Co.

In 1980, petitioners began living together in Roberts' home in Lancaster, Texas. In the summer of 1981, Roberts sold her home in Texas, and petitioners moved to Arkansas where they jointly purchased a home in Mountain Home.

During the years in issue, petitioners were not employed. The sources of their income were Veterans' and Social Security benefits, oil royalties, payments from pension plans, insurance proceeds, and proceeds from the sale of jewelry and automobiles. Petitioners maintained several joint bank accounts at various institutions. Roberts also maintained one account in her name.

During the years in issue petitioners jointly purchased and sold or exchanged the following automobiles:

| Vehicle | Date purchased | Cost | Date sold | Amount received |
|---|---|---|---|---|
| 1978 Lincoln Town Car | December 1982 | $5,000 | Fall 1983 | $5,500 |
| 1966 Ford Mustang | Spring 1982 | 1.50 ct. diamond | July 1983 | 3,500 |
| 1978 Chevy ½-ton truck | July 1983 | 3,225 | August 1983 | 3,650 |
| 1978 Cadillac Sedan Seville | July 1983 | 5,000 | Fall 1983 | 4,500 |
| 1978 Cadillac Fleetwood | June 1983 | 4,500 | June 1983 | 6,000 |
| 1978 Lincoln Mark V | 1981 | 6,000 | Spring 1983 | Trade |
| 1982 Lincoln Continental | July 1983 | 13,000 | March 1984 | Trade |
| 1979 Chevy tow truck and 1982 Cree RV | Spring 1983 | 19,000 and 1978 Lincoln Mark V | February 1984 | 25,500 |
| Chevy Suburban | June 1984 | 3,000 | July 1984 | 3,000 |
| 1978 Lincoln Town Car | November 1984 | 4,500 | November 1984 | 4,500 |

During the years in issue, petitioners also purchased and sold the following items of jewelry:

| Jewelry | Date purchased | Cost | Date sold | Amount received |
|---|---|---|---|---|
| 1.50 ct. diamond gold mounting | unknown | $3,800 | Spring 1982 | $5,000 |
| 1.50 ct. diamond gold mounting | January 1982 | 2,100 | Spring 1982 | 1966 Ford Mustang |
| 1.75 ct. diamond gold mounting | Spring 1983 | 3,500 | Spring 1983 | 5,000 |
| 1.50 ct. diamond gold mounting | Spring 1983 | 3,500 | Summer 1983 | 4,500 |
| 4.23 ct. diamond gold mounting | unknown | 6,650 | Summer 1983 | 9,250 |
| 1.18 ct. diamond gold mounting | January 1982 | 2,800 | December 1983 | 3,000 |
| Marquise diamond gold mounting | Spring 1983 | 3,800 or 4,000 | December 1983 | 5,000 |
| 2.45 ct. diamond gold mounting | February 1984 | 3,000 | March 1984 | 3,500 |
| 2.05 ct. diamond | 1983 | 7,000 | May 1984 | 8,500 |
| 2.07 ct. diamond gold mounting | Spring 1983 | 5,200 | September 1984 | 5,000 |

Proceeds from the sale of automobiles and jewelry appear to have been deposited into petitioners' joint bank accounts.

The source, however, of the majority of the funds deposited into petitioners' bank accounts was what Dodge has described as his "insurance program." Dodge's insurance program consisted of a scheme referred to appropriately in the insurance industry as insurance speculation. Insurance speculation, in the context of this case, involves the purchase of multiple hospital indemnification policies (sometimes referred to as HIP policies, HIP's, and HIP), which policies typically pay $25 to $100 for each day an insured is hospitalized, regardless of the insured's actual hospital and other medical expenses.

HIP policies typically are purchased so that the insured will have funds with which to cover the insured's deductible, the copayments, or the excess charges arising from a hospitalization that are not covered by the insured's major medical insurance policy. In some circumstances, HIP's are the sole source of insurance for individuals uninsurable through major medical plans.

HIP's are marketed by insurance companies through mass media such as radio, television, and direct mail. HIP

applications typically require little or no underwriting information and often guarantee acceptance and renewal.

Individuals who purchase HIP's as part of an insurance speculation scheme typically purchase multiple HIP's and then arrange to be hospitalized for head, neck, back, and other purported soft tissue injuries that are difficult to diagnose and that have no external signs or symptoms. The injuries complained of usually arise from alleged slip-and-fall accidents that are unwitnessed.

To carry off their scheme, insurance speculators typically seek "friendly" doctors who admit them to hospitals with little or no pre-admission diagnosis and who unnecessarily prolong the hospital stay.

During each of the years at issue, Dodge purchased the following number of HIP policies from numerous companies with the total daily benefit coverage as shown:

| Year | No. of HIP's | No. of insurance companies | Amount of daily coverage |
|------|------|------|------|
| 1981 | 33 | 26 | $873 |
| 1982 | 45 | 22 | 2,127 |
| 1983 | 61 | 35 | 2,657 |
| 1984 | 47 | 25 | 2,075 |

During 1982 through 1984, Dodge also had a major medical reimbursement policy with Blue Cross/Blue Shield of Arkansas (Blue Cross).

During the years at issue, in order to earn substantial income from his numerous HIP policies, Dodge had himself admitted to the various hospitals on the occasions and for the alleged reasons indicated below:

| Dates of hospitalization | Hospital | Alleged reason for hospitalization | Admitting physician |
|------|------|------|------|
| 3/16/81-4/6/81 | Francis A. Bell Memorial Hosp., Ishpeming, MI | Slipped on ice while exiting car. Neck and back pain. | Dr. W.G. Schroeder |
| 5/25/82-6/18/82 | Francis A. Bell Memorial Hosp., Ishpeming, MI | Hemorrhoidectomy, perforated bowel, and peritonitis. | Dr. W.G. Schroeder |

| Dates of hospitalization | Hospital | Alleged reason for hospitalization | Admitting physician |
|---|---|---|---|
| 8/5/83-8/13/83 | Baxter County General Hosp., and Mountain Home, AK transferred on 8/6/83 to St. John's Regional Health Center Springfield, MO | Fell down stairs suffered neck and back pain and and weakness in extremities. | Dr. Bert E. Park & Dr. William R. Truitt |
| 8/19/83-9/2/83 | Francis A. Bell Memorial Hosp., Ishpeming, MI | Headache, pain in neck and left arm, weakness and numbness. | Dr. W.G. Schroeder |
| 11/3/83-11/10/83 | Francis A. Bell Memorial Hosp., Ishpeming, MI | Neck and back pain stemming from fall down stairs on 8/5/83. | Dr. W.G. Schroeder |
| 4/27/84-5/11/84 | Lakeside Community Hosp. Incline Village, NV transferred on 5/7/84 to Washoe Medical Center Hosp. Reno, NV | Back pain, depression, and anxiety. | Dr. W.D. Brodie and Dr. J.P. Maloney at Lakeside and Dr. Hale Henson and Dr. Malcolm Bacchus at Washoe |
| 8/24/84-9/2/84 | Loma Linda Community Hosp., Loma Linda, CA | Fell off lawnmower and hurt back and legs. | Dr. E.T. Dombrowski & Dr. Kern H. Pihl |

As noted, Dr. Schroeder was the admitting physician for each of Dodge's four stays at Francis A. Bell Memorial Hospital. Dr. Schroeder was a personal friend of Dodge and had borrowed $50,000 from Dodge. Dr. Schroeder also had purchased from Dodge an automobile and a diamond engagement ring. In 1983, Dr. Schroeder admitted Dodge twice to the hospital for the same alleged fall and with respect to which Dodge already had been treated and released by yet another hospital.

Dr. Douglas Brodie, who on April 27, 1984, admitted Dodge to Lakeside Community Hospital, was involved with Dodge in a 600-acre real estate transaction. After being transferred on May 7, 1984, to the Washoe Medical Center in Reno, Nevada, Dodge himself decided when he was to be discharged.

After allegedly falling off his lawnmower in Arkansas in August of 1984, Dodge flew to California to be hospitalized, instead of going to a local hospital in Arkansas.

In 1982, 1983, and 1984, and with respect to the above hospitalizations, Dodge received, under his major medical reimbursement policy with Blue Cross, reimbursements totaling $5,124. Significant additional expenses relating to the above hospitalizations with respect to which Dodge sought reimbursement under his Blue Cross major medical reimbursement policy were denied as inappropriate medical expenses.

In addition to the insurance proceeds received by Dodge under his Blue Cross major medical reimbursement policy, Dodge received very substantial amounts under his many HIP policies. The following figures reflect total medical expenses Dodge incurred each year in connection with his hospitalizations, the total proceeds he received each year under his HIP policies, and the net HIP proceeds petitioner pocketed:

| Year | Hospital expenses | HIP proceeds | Net proceeds[1] |
|------|-------------------|--------------|-----------------|
| 1981 | $4,000 | $17,848 | $13,848 |
| 1982 | 6,312 | 31,823 | 25,511 |
| 1983 | 8,233 | 81,423 | 73,190 |
| 1984 | 10,900 | 126,271 | 115,371 |
| Total | 29,445 | 257,365 | 227,920 |

[1]The net proceeds and other figures in this schedule do not take into account premiums Dodge paid for the HIP policies, the amounts of which are not in the record, nor the $5,124 Dodge received under his Blue Cross major medical reimbursement policy.

At various times throughout the years at issue, a number of the insurance companies discovered that Dodge was carrying an excessive number of HIP policies and an excessive amount of HIP coverage. They negotiated with Dodge for cancellation of the HIP policies they had issued to him. Dodge agreed not to apply with those companies for any new HIP policies, and they paid Dodge a fixed amount for the cancellations.

Insurance speculation is regarded as a crime under Federal and State law. Dodge, however, was not prosecuted for engaging in insurance speculation during the years in issue.

In January of 1984, petitioners' home in Mountain Home, Arkansas, was destroyed by fire. Petitioners' home was

insured for $145,000 on the dwelling and $112,000 on the contents. The insurer paid $143,208 to the mortgage holder with respect to the fire damage and $60,000 to petitioners with respect to the contents. Attorneys' fees incurred by petitioners in connection with negotiations with the insurer concerning the fire damage were $15,500. Proceeds from the fire insurance were deposited into petitioners' various joint bank accounts.

Dodge failed to file Federal income tax returns with respect to each year at issue. Roberts timely filed an individual Federal income tax return with respect to each year at issue. Roberts, however, did not include in her tax returns any income from the sale of jewelry or automobiles, nor did she include any of the proceeds from the HIP policies on her income tax returns.

Roberts claimed interest deductions on her 1981, 1983, and 1984 tax returns in the respective amounts of $5,715, $1,000, and $1,032.

On audit, respondent analyzed bank statements and deposit slips from petitioners' various bank accounts to determine petitioners' separate taxable income. Use of the bank deposits method by respondent was necessitated because petitioners lacked financial records for the years at issue. Apparently, petitioners' records were destroyed in the 1984 fire that destroyed their home. Respondent treated all of the proceeds Dodge received on his HIP policies as taxable income to Dodge.

The parties have categorized the deposits into petitioners' bank accounts and the source thereof as follows:

| Source | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|
| Nontaxable | $460 | $19,638 | $133,992 | $32,873 |
| Insurance proceeds | 17,848 | 31,823 | 81,423 | 126,271 |
| Miscellaneous | - - - | 15,784 | 22,229 | 114,076 |
| Unknown | 20,707 | 2,768 | 56,755 | 13,151 |
| Reported by Roberts on her tax returns | 126 | 751 | 1,552 | 1,229 |

On audit, respondent determined that the deposits characterized as "Miscellaneous" and "Unknown" were taxable income either to Dodge or to Roberts.

OPINION

*Insurance Proceeds*

Section 104(a)(3) excludes from income "amounts received through accident or health insurance for personal injuries or sickness."

Dodge argues that the insurance proceeds he received under his HIP policies are excludable from income under section 104(a)(3) because they were received with respect to his many alleged injuries and sicknesses and resulting hospitalizations. In support of his position, Dodge cites *Deming v. Commissioner*, 9 T.C. 383 (1947), and Rev. Rul. 69-154, 1969-1 C.B. 46. *Deming*, however, involved the deductibility of medical costs and whether the taxpayer was reimbursed through insurance. This is not the issue before us and lends no support to Dodge's position. The issue addressed in Rev. Rul. 69-154 was whether certain insurance proceeds were attributable to the taxpayer's cost or to the employer's cost. Insurance speculation was not involved.

Based on the evidence before us, we cannot, and do not, conclude that the proceeds Dodge received under his HIP policies during the years at issue related to actual, legitimate personal injuries or sickness. The testimony of Dodge and Roberts concerning the alleged injuries and sickness lacked credibility. Dr. Schroeder's testimony also lacked credibility. Further, the medical and hospital records offered by Dodge, on the facts of this case, do not establish Dodge's injuries or sickness.

The circumstantial evidence in this case raises serious questions concerning the legitimacy of Dodge's alleged injuries and sickness. The number of hospital admissions, the nature of the alleged injuries and sickness, the location of the hospitals, the relationship of Dodge with his doctors, combined with the existence of the multiple HIP policies and petitioners' lack of credibility, support our conclusion.

The statutory language requires that to be excludable, the amounts must be paid "for personal injuries or sickness." Sec. 104(a)(3). The mere fact that the amounts in question in this case were paid to Dodge by insurance companies under HIP policies does not establish that such amounts, in fact, related to actual injuries and sickness, and petitioners have

not established that the amounts did relate to any such actual injuries and sickness. To the contrary, the evidence strongly suggests that many if not all of the hospital admissions did not relate to actual injuries or sickness, but were contrived so that Dodge could file claims under his many HIP policies. Rule 142(a).

Respondent did not argue in this case that Dodge committed fraud in connection with his insurance speculation scheme, and our conclusion on this issue is not intended as a finding that fraud occurred. Respondent, however, did not concede that the HIP proceeds Dodge received related to actual personal injuries or sickness.

Our analysis herein is based, in part, on the principle that the mere fact insurance companies pay claims under medical insurance policies does not necessarily result in an exclusion under section 104(a)(3) of the proceeds received by a taxpayer under the policies. Where the evidence establishes that claims made by a taxpayer under medical insurance policies were not legitimate and not made in good faith, or that the claims did not relate to actual injuries or sickness of the taxpayer (or where the evidence raises significant questions concerning the above), the exclusion under section 104(a)(3) is not available. This result is particularly appropriate and applicable where the taxpayer has the burden of proof under Rule 142(a), as do petitioners herein.

For the reasons stated, the total insurance proceeds Dodge received each year on his HIP policies represent income, and are not excludable under section 104(a)(3).

### Unidentified and Miscellaneous Deposits

Because petitioners produced no financial records, respondent used the bank deposits method to determine petitioners' separate income for each year. In summary, the bank deposits method reconstructs a taxpayer's income through an examination of deposit and withdrawal transactions involving a taxpayer's bank accounts. The burden, generally, is on taxpayers to show that the bank deposits were derived from nontaxable sources. Rule 142(a); *Reaves v. Commissioner*, 31 T.C. 690, 718 (1958), affd. 295 F.2d 336 (5th Cir. 1961); *Romer v. Commissioner*, 28 T.C. 1228, 1244 (1957).

Petitioners appear to argue that because the majority of the deposits to their bank accounts have been identified, we should assume that the remaining unidentified deposits are not taxable. Having identified the majority of the deposits, however, as constituting taxable income, if any inference is to be drawn therefrom, it would be that the remaining unidentified deposits also constitute, and should be treated as, taxable income. Petitioners have failed to show that the remaining unidentified deposits and the miscellaneous deposits constituted nontaxable income, and petitioners have not overcome the presumption that they are taxable. *Zeeman v. United States*, 395 F.2d 861, 866-867 (2d Cir. 1968).

A portion of the unidentified and miscellaneous deposits is attributable to petitioners' sales of automobiles and jewelry. Income derived from these two activities will be divided equally between Dodge and Roberts. The balance of the unidentified and miscellaneous deposits into petitioners' joint bank accounts will be included in Dodge's income, except for the following deposits, which will be included in Roberts' income:

| Year | Account No. | Amount | Identified as |
|------|-------------|--------|---------------|
| 1982 | 044-872-9 | $2,684.97 | Check to Roberts |
| 1983 | 044-872-9 | 89.44 | Check to Roberts |
| 1984 | 5940661 | 242.34 | Check endorsed to Roberts |

The unidentified and miscellaneous deposits made into Roberts' individual bank account at Home Federal Savings & Loan will be included in Roberts' income, except for the $1,000 check from Dr. Schroeder to Dodge, which will be included in Dodge's income.

## Interest Deductions

Interest paid on indebtedness within a taxable year is allowed as a deduction under section 163(a). The parties have stipulated that petitioners paid interest of $5,715, $7,795.98, $23,137.04, and $11,846.91 in 1981, 1982, 1983, and 1984, respectively. The issue remaining regarding these payments is the allocation thereof between petitioners. Based on the record, the interest payments that were claimed by Roberts on her 1981, 1983, and 1984 tax returns

are deductible by her. The balance of the interest payments that were made each year are deductible by Dodge.

## Additions to Tax and Statute of Limitations

Petitioners dispute the additions to tax. Additions to tax under section 6651(a)(1) are imposed for failure to timely file Federal income tax returns. Dodge was determined to owe the addition to tax under section 6651(a)(1) because he filed no returns for 1981, 1982, 1983, and 1984. Taxpayers may be relieved of this addition to tax if it is shown that the failure to timely file was due to reasonable cause and not to willful neglect.

Dodge's explanation for not filing returns is that he did not believe any were necessary. Dodge, however, had substantial income from the sale of automobiles, jewelry, and the proceeds from insurance speculation. There is no legitimate basis for Dodge's alleged belief that he was not required to file Federal income tax returns, and we sustain the additions to tax under section 6651(a)(1).

Section 6654 imposes an addition to tax on taxpayers who fail to pay estimated income tax. Section 6654 additions as to the years at issue are mandatory regardless of extenuating circumstances. *Grosshandler v. Commissioner,* 75 T.C. 1, 21 (1980). Dodge is liable for the additions to tax under section 6654.

Respondent determined that both petitioners were liable under section 6653(a)(1) and (2) for additions to tax due to negligence on the underpayments. For purposes of section 6653, the standard for determining negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Zmuda v. Commissioner,* 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); *Neely v. Commissioner,* 85 T.C. 934, 947 (1985).

Petitioners' underpayment of tax was clearly due to negligence, if not the intentional disregard of rules and regulations. Under the circumstances of this case, Dodge's complete failure to file tax returns for the years in issue was not reasonable. Although Roberts filed returns, she failed to report income that a reasonable person would have

reported under the circumstances, namely proceeds from the sale of automobiles and jewelry.

We hold that the additions to tax determined under section 6653(a)(1) and (2) are sustained and shall be computed based on the entire deficiencies with respect to both petitioners.

The addition to tax under section 6661(a) applies when the taxpayer has substantially understated his income tax. Taxpayers may reduce the amount of the understatement to which this addition is applied by adequate disclosure on the tax returns of the income or transactions in question or by having substantial authority for the tax treatment of the item.

Dodge filed no tax returns on which a disclosure could have been made, and Roberts failed to make a disclosure on her returns. Neither petitioner has offered substantial authority that the income they received over the years in issue should not be taxed. The additions under section 6661 shall be assessed against the entire understatement for each year.

Roberts raises the 3-year statute of limitations under section 6501(a) for 1981 and 1982. Respondent asserts the applicability of the 6-year statute of limitations under section 6501(e). This issue turns solely on the computations under Rule 155 and whether such computations reflect omissions of gross income on Roberts' tax returns, as filed, in excess of 25 percent of the amount of gross income stated in the returns.

All other arguments made by petitioners have been considered and are without merit.

*Decision will be entered under Rule 155.*