JAMES L. HUDSON, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 4272–92.          Filed July 27, 1994.

James L. Hudson, pro se.
*T. Richard Sealy III,* for respondent.

SWIFT, *Judge:* Respondent determined deficiencies in and additions to petitioner's individual Federal income tax as follows:

*Additions to tax*

| Year | Deficiency | Sec. 6621(c) | Sec. 6653(b) | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6654 | Sec. 6661 |
|------|-----------|--------------|--------------|-----------------|-----------------|-----------|-----------|
| 1981 | $178,338 | [1] | $89,169 | --- | --- | $13,663 | --- |
| 1982 | 373,175 | [1] | --- | $186,588 | [2] | 33,446 | $93,294 |
| 1983 | 365,637 | [1] | --- | 182,819 | [2] | 22,372 | 91,409 |
| 1984 | 83,644,046 | [1] | --- | 41,822,023 | [2] | 5,258,801 | --- |
| 1985 | 82,454,846 | [1] | --- | 41,227,423 | [2] | 4,725,002 | --- |

[1] 120 percent of the interest accruing after Dec. 31, 1984, on the portion of the underpayment attributable to a tax-motivated transaction.
[2] 50 percent of the interest due on the portion of the underpayment attributable to fraud.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues remaining for decision are: (1) Whether purported promissory notes associated with an investment in educational master audio tapes had economic substance and constituted genuine indebtedness that is to be recognized for Federal income tax purposes; (2) the extent to which petitioner is entitled to depreciation deductions with respect to the educational master audio tapes; (3) whether petitioner received taxable income from the discharge of indebtedness; and (4) whether petitioner is liable for the various additions to tax and increased interest.[1]

The parties have stipulated the admissibility in these proceedings of the extensive trial record developed in Federal

---

[1] Respondent has conceded the fraud additions to tax and asserted in the answer negligence additions to tax under sec. 6653 for 1981 through 1985.

District Court proceedings in *United States v. Texas Basic Educational Systems,* CA No. H–85–1330 (S.D. Tex., Aug. 16, 1988), affd. *United States v. Texas Basic Educational Systems, Inc.,* No. 88–2994 (5th Cir., Apr. 3, 1990), a case in which respondent's complaint for an injunction under sections 6700 and 7408 against the sale and promotion of the tax shelter at issue herein was denied. The record herein also includes testimony and exhibits that were not offered in the above-referred-to District Court proceedings.

## FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

At the time the petition was filed, petitioner resided in Austin, Texas.

During 1982 through 1985, through Texas Basic Educational Systems, Inc. (TBES), petitioner's wholly owned S corporation, petitioner promoted a tax-oriented investment program under which TBES was to purchase educational master audio tapes (master tapes) and then lease the master tapes to investors. The investors, in turn, were to make cassette copies of the master tapes and to sell the cassette copies of the master tapes on a retail basis to consumers.

On August 11, 1982, Educational Audio Resources, Inc. (EAR), was incorporated in the State of Texas to produce and to sell to TBES the master tapes that were to be leased to investors. EAR was owned equally by Michael Brovsky (Brovsky) and Chet Hanson (Hanson). Neither Brovsky, Hanson, nor petitioner had any experience in producing or marketing educational or informational master audio tapes.

*Purchase and Production of Master Tapes*

During 1982 and 1983, TBES entered into agreements for the purchase from EAR of master tapes for the stated purchase price of $200,000 each. Under the terms of the purchase agreements, the $200,000 stated purchase price for each master tape was to be reflected by a $5,000 cash downpayment and a $195,000 purportedly recourse promissory note bearing interest at 10 percent per year and secured by the master tape. In 1982 and 1983, TBES executed in favor of EAR approximately 100 promissory notes in the cumulative total amount of $19,500,000 with regard to the master tapes.

Under the terms of the promissory notes, unless TBES realized profits from the lease of the master tapes, TBES had no obligation to make payments of principal or interest on the promissory notes for 10 years. If, during the first 10 years of the promissory notes, TBES did realize profits from the lease of the master tapes, payments of principal and interest on the promissory notes were to be made to the extent of 30 percent of the net profits realized. At the end of 10 years, the balance due on the promissory notes plus accrued interest was stated to be due.

During 1982 through 1985, TBES' assets consisted almost entirely of the master tapes purchased from EAR. Further, under the terms of the promissory notes, EAR's only security for payment of the promissory notes was the master tapes and any cassette copies made therefrom.

As of the time of trial, TBES had not made any payments of principal or interest on any of the promissory notes. TBES' purported liability on the promissory notes was not reflected on the books and records of TBES. Similarly, TBES' purported liability on the promissory notes was not reflected as a receivable on the books and records of EAR.

The budgeted and actual total production costs to EAR for each master tape were approximately $500, which included between $100 and $200 for a script writer, the cost of recording each master, and art work relating to the cassette copies of the master tapes. The script writers were unknown artists, and the written script material was generic.

Petitioner and his associates identified approximately 500 suggested titles for the master tapes that were to be produced for TBES by EAR. The suggested titles included "Understanding How People Pollute", "Garage Sales that Make You Money", "Ensure a Smash New Year's Eve Party", and "Speedy Shelter Secrets".

Petitioner submitted to three marketing analysts a list of the suggested titles for the master tapes and asked each analyst to prepare a marketing study as to the value of educational master audio tapes assuming the tapes were produced, assuming the subject matter of the tapes related to the suggested titles, and assuming that cassette copies of the master tapes were marketed under the suggested titles.

At the time the analysts were hired by petitioner, petitioner informed the analysts that he sought to have each of

the master tapes valued at a dollar amount that would reflect the realization of gross profits for an investor from the sale of cassette copies of each master tape over a 10-year period of at least $200,000.

Before the analysts' marketing studies were completed and received, EAR had produced a number of master tapes, and petitioner had already designated titles for them.

The analysts included in their studies, at petitioner's request, an appraisal of the fair market value of each proposed master tape (even though many of the tapes had not yet been produced), which appraisal was based on the projected profit figures provided by petitioner. None of the analysts had experience appraising master audio tapes, and none of the analysts listened to any of the master tapes or to any of the cassette copies of the master tapes that were to be leased by TBES to investors.

At petitioner's direction, the analysts performed their marketing studies and appraisals based, in large part, on the following additional assumptions: (1) That each master tape would have a useful life of 10 years; (2) that national distribution of cassette copies of the master tapes would be effected by retail, mail order, and other methods of advertising and distribution; (3) that through the sale of cassette copies of the master tapes, investors would realize the average sales proceeds of other available educational recordings; (4) that the $200,000 purchase price for each master tape was arrived at by arm's-length bargaining between TBES and EAR; and (5) that the finished master tapes would be of professional quality.

Even with the above assumptions, the three analysts concluded that of the 500 suggested master tape titles only between 218 and 313 of the proposed master tapes had a gross profits potential of $200,000 or more.

In fact, and contrary to the above assumptions on which the three analysts relied, the quality of the master tapes was generally poor.[2] The script or content of the master tapes was written by unknown authors, and the voices of unknown individuals were used to record the scripts onto the master

---

[2] The parties agree that the 56 cassette tapes entered into evidence in this case are a representative sample of the content and quality of the master tapes.

tapes. Many of the scripts were poorly written and were not long enough.

Mispronunciations and grammatical errors occur on the master tapes. Music occurs only at the beginning and ending of most of the master tapes. The music that is on the master tapes does not enhance the quality of the tapes.

With regard to a number of master tapes, petitioner instructed an employee of EAR to record on the master tapes only portions of a designated script (e.g., to record on the master tapes only the beginning and ending of the script), and petitioner indicated that he would complete the recording later. Master tapes, however, that were uncompleted were leased to investors, and, as of December 31, 1983, many of the master tapes were still unfinished.

In 1984 and 1985, some of the scripts were rewritten and many of the master tapes were still being produced and edited.

In December of 1982, it was represented by EAR that 250 master tapes, apparently produced by EAR, were shipped for storage to the First Bank of Billings, Montana (Bank of Billings). The Bank of Billings received boxes purportedly containing the 250 master tapes and stored the boxes in a bank vault. As of January of 1986, no storage fees had been paid to the Bank of Billings. The boxes received no special handling, were not kept in a climate-controlled area, and were not insured.

Each shipping receipt with regard to the transfer to the Bank of Billings of the boxes purportedly containing the 250 master tapes was signed by representatives of EAR and reflected that the total "actual value" of the contents of each shipping box (each box purportedly containing 20 master tapes) was $1,000.

EAR began producing master tapes in November and December of 1982, and it continued producing master tapes in early 1983. From the record in this case, it is not possible to determine how many master tapes EAR actually produced and sold to TBES in each separate year, but it appears and we find that only a total of 125 master tapes was produced by EAR and sold to TBES over the course of both 1982 and 1983. EAR apparently never leased master tapes to any person or entity other than TBES.

Some evidence in the record suggests TBES itself may have produced some master tapes in 1983. The evidence, however, is incomplete and unpersuasive in this regard, and we find, for purposes of this case, that no master tapes were produced by TBES in 1982 and 1983.

The evidence is clear and the parties have stipulated that as of the time of the trial in this Court, in March of 1993, all 423 master tapes that were the subject of lease agreements with investors had been produced.

*Lease of Master Tapes and Tax Aspects of Investments*

Each investor agreed to pay TBES for the lease of each master tape $10,000 in cash and 60 percent of the revenue generated from the sale of cassette copies of the master tapes. The lease of each master tape was for a term of 66 months.

During 1982 and 1983, TBES and petitioner entered into 423 lease agreements with individual investors with respect to master tapes that were purportedly produced and completed.

For 1982 and 1983, TBES elected to pass through to each investor the $20,000 investment tax credit (ITC) purportedly available to TBES with respect to each master tape. The ITC election forms stated that the fair market value of each master tape was $200,000 and that the estimated useful life of each master tape was 7 years or more. Investment tax credits claimed on the investors' 1982 and 1983 individual Federal income tax returns with regard to their investments in the master tapes were in the cumulative total amount of $8,460,000.

Tax benefits were a primary focus of the promotion and lease of the master tapes to individual investors. For example, TBES represented in the promotional materials the advantages of the lease program as follows:

(1) The lessee had no recourse notes to sign since TBES assumed full responsibility for the notes;

(2) The lessee could deduct the prepaid rental from their Federal income taxes over the period of the lease agreement; and

(3) TBES would pass through to the investors investment tax credits totaling $20,000 per tape.

In the promotional materials, it was represented further that the master tapes that would be leased to investors would be only those master tapes that at least two of the three marketing analysts appraised at a gross profit potential of at least $200,000. Among the master tapes actually leased to investors, however, were those that two of the three marketing analysts appraised at a gross profit potential of less than $200,000.

Rarely, if ever, did individual investors listen to the master tapes or to cassette copies of the master tapes before entering into the lease agreements, and rarely, if ever, did the investors take possession of the master tapes they leased.

*Marketing and Distribution of Cassette Copies of the Master Tapes*

Petitioner assured individual investors that TBES or an outside consultant would be responsible for making cassette tape copies of the master tapes and for marketing and distributing the cassette copies. In April of 1983, at petitioner's initiation, a Texas corporation named Hallmark Communications, Inc. (Hallmark), was formed to provide marketing and distribution services to the investors with regard to cassette copies of the master tapes. Although the distribution agreements were between Hallmark and the investors, petitioner established the terms of the distribution agreements.

Over 200 investors signed distribution agreements with Hallmark to market cassette copies of the master tapes. Hallmark, however, could not cover the costs of marketing the master tapes, and in the summer of 1984 Hallmark began charging the investors $100 per month to market the master tapes. Only 40 investors agreed to pay this fee.

Hallmark designed a catalog that contained a description of the various cassette tape copies of the master tapes that were purportedly available for purchase, a description of the TBES master tape program, and instructions for ordering the tapes. Only a few copies of the catalog were mailed.

During 1984 and 1985, Hallmark placed a number of advertisements in the Wall Street Journal and Parade Magazine and received a few orders for cassette copies of some of the master tapes.

In early 1983, petitioner made a presentation to the vice president of sales and marketing for Pan American Airlines (Pan Am) to encourage Pan Am to purchase or lease master tapes for use on its airplanes. Petitioner's proposal was rejected by Pan Am because Pan Am representatives concluded that the master tapes were of poor quality and of little interest.

Hallmark did not have an adequate advertising budget with respect to the master tapes. Hallmark did not maintain an inventory of the cassette tapes offered for sale, and Hallmark was not able to fill any orders. Hallmark's marketing efforts for the investors were wholly inadequate.

On December 15, 1984, petitioner acquired all of Hallmark's outstanding stock for a total purchase price of $1.

## Petitioner's Purchase of EAR

On January 5, 1984, petitioner formed a Texas corporation by the name of J. Scream Corp. (J. Scream) to acquire EAR's stock from Brovsky and Hanson. On January 6, 1984, a stock purchase agreement was executed between Brovsky and Hanson and Claudia Raun (as vice president of J. Scream) for the purchase by J. Scream of 100 percent of the outstanding stock of EAR for a total consideration of two $37,500 promissory notes. The EAR stock was to be placed in escrow. The escrow agent was to hold the EAR stock until the two $37,500 promissory notes were paid in full.

In the stock sales agreement referred to above, the promissory notes that TBES executed in favor of EAR (which total amount exceeded $19,500,000) were not listed as assets of EAR. On January 6, 1984, when the stock purchase agreement between EAR and J. Scream was executed, the parties to the transaction did not consider these promissory notes in reaching the terms of the agreement. The stock purchase agreement between EAR and J. Scream was never closed because J. Scream defaulted on its payment obligation under the stock purchase agreement.

Although Hanson apparently was paid by the escrow agent for his EAR stock, Brovsky was not paid for his EAR stock, and under the terms of the stock purchase agreement, Brovsky reacquired all of the EAR stock from escrow.

On October 5, 1984, petitioner, anonymously and through an agent, finally purchased from Brovsky all of the outstanding EAR stock in exchange for petitioner's payment of an unrelated $18,000 judgment that was outstanding against Brovsky.

## Other Proceedings

In 1984, respondent began a criminal tax investigation of petitioner and TBES relating to the master tape investment program. The investigation continued until early 1988. A grand jury investigation was conducted, but the grand jury was not asked to return an indictment against petitioner, and respondent's investigation was dropped.

In March of 1985, respondent commenced in the U.S. District Court for the Southern District of Texas (District Court) proceedings under sections 6700 and 7408 seeking an injunction against any further promotion by petitioner and TBES of the master tapes, alleging that investments in the master tapes constituted an abusive tax shelter scheme. Respondent also alleged that the master tapes were overvalued by more than 200 percent.

On August 16, 1988, after a lengthy trial, the District Court found that the master tapes leased by TBES and petitioner to investors were not overvalued by more than 200 percent, that each master tape was worth at least $100,000, and that petitioner had not done anything illegal in promoting the master tapes. The District Court therefore denied respondent's request for an injunction. *United States v. Texas Basic Educational Systems,* CA No. H–85–1330 (S.D. Tex., Aug. 16, 1988).

Respondent appealed the District Court judgment to the U.S. Court of Appeals for the Fifth Circuit. On April 3, 1990, in an unpublished one-paragraph opinion, the Court of Appeals affirmed the District Court judgment that no injunction should be issued against further promotion of the master tapes by TBES or by petitioner. The affirmance by the Court of Appeals, however, was expressly based only on the conclusion that there existed no threat of a continuing violation of Federal tax law because TBES and petitioner had ceased promoting the tax shelter. The Court of Appeals entire opinion reads as follows:

This is an appeal from a denial of an injunction by a United States District Court. The Internal Revenue Service requested that defendants be enjoined from engaging in activities violative of statutes and rules regulating tax shelters. We affirm the denial of injunctive relief but not for the reasons stated by the district court. Rather, we affirm the denial of injunctive relief for the reason that the record is bereft of evidence sufficient to warrant a conclusion that continuing violations were threatened. The transactions complained of by the government have apparently collapsed of their own weight. We emphasize that we do not suggest that the government was incorrect in its contentions that the complained of transactions were not legal. [*United States v. Texas Basic Educational Systems, Inc.*, No. 88–2994 (5th Cir., Apr. 3, 1990); fn. ref. omitted.]

## *Petitioner's Tax Returns and IRS Audit*

On December 21, 1988, petitioner untimely filed his 1982 and 1983 individual Federal income tax returns on which returns petitioner claimed substantial losses of $2,456,264 and $13,458,497, respectively, pertaining to reported losses of TBES, his S corporation. The losses claimed by petitioner were attributable to depreciation deductions that were claimed by TBES with respect to the master tapes that flowed through to petitioner's individual income tax returns. TBES claimed depreciation deductions with respect to 115 master tapes allegedly placed in service in 1982 and 308 master tapes allegedly placed in service in 1983.

As of the date of trial herein, petitioner had not filed individual Federal income tax returns for 1981, 1984, and 1985.

On audit, respondent disallowed petitioner's claimed losses relating to TBES for 1982 and 1983 on the grounds, among others, that the $195,000 promissory notes were not genuine, that the master tapes purchased by TBES had little or no value, that the promissory notes and the master tapes did not provide petitioner a tax basis to support the large depreciation deductions claimed, and that the master tapes were not placed in service in 1982 and 1983.

Respondent also determined that in either 1984 or 1985, TBES received $82,435,000 in discharge of indebtedness income resulting from petitioner's purchase of 100 percent of EAR's outstanding stock and the alleged discharge of TBES' liability on 100 of the $195,000 promissory notes. Respondent also determined the various additions to tax and increased interest.

OPINION

*Economic Substance and Genuineness of Promissory Notes*

Transactions that are entered into solely for the purpose of obtaining tax benefits and that are without economic substance are considered shams for Federal income tax purposes and purported indebtedness associated therewith will not be recognized. *Frank Lyon Co. v. United States,* 435 U.S. 561, 573 (1978); *Knetsch v. United States,* 364 U.S. 361 (1960); *Sochin v. Commissioner,* 843 F.2d 351, 353 (9th Cir. 1988), affg. *Brown v. Commissioner,* 85 T.C. 968 (1985); *Bail Bonds by Marvin Nelson, Inc. v. Commissioner,* 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986–23; *Helba v. Commissioner,* 87 T.C. 983, 1004 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988). We have defined a sham transaction as a transaction that is lacking in objective economic reality and that has no economic significance beyond expected tax benefits. *Falsetti v. Commissioner,* 85 T.C. 332, 347 (1985).

In deciding whether transactions lack economic substance, we consider such factors as the lack of arm's-length negotiations, inflated purchase prices, the structure of the financing of the transactions, and the degree of adherence to contractual terms. *Rose v. Commissioner,* 88 T.C. 386, 410–411 (1987), affd. 868 F.2d 851 (6th Cir. 1989); *Helba v. Commissioner, supra* at 1004.

The financing of transactions with deferred indebtedness that is very unlikely to be paid is a strong indication of the lack of economic substance. See, e.g., *Frank Lyon Co. v. United States, supra* at 582 n.17; *Burns v. Commissioner,* 78 T.C. 185, 212 (1982). To be recognized for Federal income tax purposes, transactions must have economic substance that is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached". *Frank Lyon Co. v. United States, supra* at 583–584.

Our analysis focuses on the substance rather than the form of the transactions. *Gregory v. Helvering,* 293 U.S. 465 (1935); *Waddell v. Commissioner,* 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988).

Respondent herein has conceded that TBES, in the years at issue, conducted some of its activities for a profit, and the parties agree that petitioner is entitled to certain business deductions with respect to TBES' leasing activities. Respondent argues, however, that the only profit expected by petitioner was the cash profit to be realized by TBES from leasing the master tapes to investors for the initial $10,000 cash downpayments due on the leases, after taking into account TBES' costs of $5,000 or less to purchase and/or produce each master tape.

With regard to the $195,000 promissory notes that were issued by TBES to EAR, respondent argues that the promissory notes lacked economic substance, that they were not the result of arm's-length negotiations, and that they do not constitute genuine indebtedness.

Petitioner argues that because TBES' $195,000 promissory notes were on their face full recourse promissory notes and were secured by the master tapes, the promissory notes constituted valid and genuine indebtedness. Petitioner notes that the analysts and petitioner's expert witness valued a number of the master tapes in excess of $200,000.

We agree with respondent's contention that the promissory notes lacked economic substance and did not constitute genuine indebtedness. The promissory notes were not executed as a result of arm's-length negotiations between petitioner and representatives of EAR. The promissory notes did not reflect the fair market value of the master tapes, and they were based on a grossly inflated purchase price for the master tapes. The promissory notes were not executed for independent non-tax-motivated reasons.

As we explain below, each master tape had a fair market value of $5,000 or less, and the gross discrepancy between the fair market value of each master tape and the stated purchase price therefor strongly indicates the nongenuine nature of the indebtedness.

TBES' promissory notes were not likely to be paid and had the sole purpose of creating an artificial tax basis in the master tapes in order to generate improper depreciation deductions and investment tax credits for petitioner and the investors.

EAR did not intend to collect on the promissory notes, and the documentation and other facts and circumstances of this

case demonstrate that they were uncollectible. The promissory notes were secured solely by the master tapes and were enforceable against TBES, an S corporation with assets consisting almost entirely of overvalued master tapes.

There were no sales of cassette copies of the master tapes, and no payments were ever made on the promissory notes.

The totality of the facts and circumstances in this case establishes that the $195,000 promissory notes executed by TBES to EAR in exchange for the master tapes were not the result of arm's-length bargaining and were in substance sham notes lacking in any economic significance beyond the desired tax benefits. For Federal income tax purposes, the $195,000 promissory notes will not be recognized as valid, genuine indebtedness.

*Fair Market Value of Master Tapes*

Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. *Chiu v. Commissioner,* 84 T.C. 722, 730 (1985); sec. 1.170A–1(c)(2), Income Tax Regs.; sec. 20.2031–1(b), Estate Tax Regs. Cost is generally good evidence of fair market value. *Soriano v. Commissioner,* 90 T.C. 44, 58 (1988). The fair market value of property is a question of fact to be ascertained from all relevant facts and evidence. *Morris v. Commissioner,* 761 F.2d 1195, 1200 (6th Cir. 1985), affg. T.C. Memo. 1982–508.

Opinions of expert witnesses are admissible and relevant to the issue of value, but the opinions must be weighed in light of the experts' qualifications and all other relevant evidence. *Johnson v. Commissioner,* 85 T.C. 469, 477 (1985); *Winans Grantor Trust v. Commissioner,* T.C. Memo. 1989–653 (citing *Estate of Hall v. Commissioner,* 92 T.C. 312, 338 (1989)). Expert witnesses may lose their usefulness and credibility when they merely become advocates for the positions argued by parties. See, e.g., *Laureys v. Commissioner,* 92 T.C. 101, 129 (1989).

Petitioner argues that each master tape had a fair market value of $200,000 or more. Petitioner alternatively argues that we should follow the District Court's finding in *United States v. Texas Basic Educational Systems,* CA No. H–85–

1330 (S.D. Tex., Aug. 16, 1988), to the effect that each master tape had a fair market value of at least $100,000.

Respondent argues that the master tapes were grossly overvalued and that the fair market value of each master tape was less than $1,000.

Both petitioner and respondent introduced expert witness testimony and reports as to the fair market value of the master tapes. Because of fundamental differences in approach between the experts and the assumptions made by petitioner's analysts and the expert witnesses engaged by both parties, the values arrived at in the reports are extremely far apart.

With regard to the studies received by petitioner from the analysts, we find that the analysts' studies—particularly given the numerous assumptions upon which their studies were based—are not useful in establishing the fair market value of the master tapes.

Petitioner's expert witness is a specialist in appraising businesses and business properties and had never before performed appraisals of educational audio recordings. Petitioner's expert witness listened only to 10 of the 56 cassette tape copies that are in evidence in this case and that the parties have stipulated constitute a representative sample of the master tapes.

Petitioner's expert witness based his conclusions, in large part, upon the data compiled by the three marketing analysts in their studies, but he did not speak to any of the analysts regarding the data in their studies. Based on the estimates of annual sales that were contained in the analysts' studies, petitioner's expert witness projected a potential annual gross profit from each master tape. Petitioner's expert witness concluded that at a sales price of $9.95 per cassette tape, the gross profit per cassette tape sold would be approximately $2.68 to $2.78, that approximately 19,000 cassette tape copies per master tape would be sold each year for 10 years, and that the average fair market value of each master tape was $275,196.

Respondent's expert witness has been employed in the audio recording industry for 30 years and has owned two corporations that have been involved in the license, sale, lease, and purchase of master recordings. Respondent's expert witness has prepared approximately 600 formal written apprais-

als to establish the potential stream of income from master recordings.

Respondent's expert witness appraised the same sample of cassette tape copies of the master tapes as did petitioner's expert witness. Respondent's expert witness appraised the master tapes using two methods—replacement cost and potential stream of income. He listened to all of the cassette tape copies in the sample, and he analyzed the quality of the production and packaging. He also researched the artist purportedly responsible for writing each script, and he considered the costs of distributing the cassette tape copies to retail consumers.

Respondent's expert witness found that each of the cassette tape copies produced from the respective master tapes was inferior in one or more of the following ways: (1) The quality of the recording was poor; (2) the script contained generic material developed by an unknown artist; (3) the script was recorded by an unknown artist; (4) the cassette tape copy contained egregious mispronunciations of key words and grammatical mistakes that were not edited; (5) no text or biographical material accompanied the cassette tape copy; and (6) either the cassette tape copy lacked sound effects or generic music was used.

Respondent's expert witness concluded that the combined retail and institutional market potential for each master tape was extremely small and that less than 1,000 cassette tape copies of each master tape would likely be sold. He also concluded that the net proceeds from such sales would not likely cover the costs of producing the master tapes, nor the cost of producing and packaging the cassette tape copies. Respondent's expert witness concluded that the replacement cost of the master tapes was between $500 and $1,000 each. He also concluded that under both the replacement cost method and the projected stream of income method, each of the 62 master tapes had a fair market value of less than $1,000.

We agree generally with respondent's expert witness.

Even with adequate marketing efforts, the likelihood was minuscule that enough cassette tape copies would be sold to generate a $200,000 gross profit for each master tape.

In our opinion, the best evidence as to the fair market value of the master tapes was the amount of cash (in the

form of downpayments paid by TBES to EAR, or production costs incurred by TBES) that petitioner was willing to risk. See, e.g., *Pacific Sound Prod. Ltd. Partnership v. Commissioner,* T.C. Memo. 1993–253; *Goldman v. Commissioner,* T.C. Memo. 1988–355.

The record supports a conclusion that in 1982 and 1983 lease agreements with respect to 423 purported master tapes were entered into between TBES and investors. The record, however, does not support a conclusion that the same number of actual master tapes had been produced and existed during 1982 and 1983.

Based on a careful analysis of the evidence in this case, we have concluded that by the end of 1983 only 125 master tapes were produced, and that in 1982 and 1983 EAR sold to TBES a total of only 125 master tapes. We find that these 125 master tapes had a fair market value equal to the cash downpayment due from TBES of $5,000 per master tape.

With respect to the other 297 master tapes that apparently were produced in subsequent years, we do not determine a value therefor because no depreciation deductions claimed for subsequent years with respect thereto are before us.

We are mindful that the District Court found that each master tape had a fair market value of at least $100,000. We concluded, however, in *Hudson v. Commissioner,* 100 T.C. 590 (1993), that respondent was not precluded from contesting the value of the master tapes in this case, nor were we bound by the findings of the District Court as to the value of the master tapes. We have considered the entire record in this case, and we are convinced that our findings as to value are accurate and generous and are amply supported by the facts and testimony contained in the record.

### Depreciation of Master Tapes

For purposes of depreciation, a taxpayer's basis in property is generally the cost of the property, and this cost generally includes genuine indebtedness incurred in acquiring the property. Secs. 1011 and 1012; *Crane v. Commissioner,* 331 U.S. 1 (1947); *Waddell v. Commissioner,* 86 T.C. 848, 898 (1986).

We have found that the $195,000 promissory notes that TBES executed in favor of EAR are not to be recognized for tax

purposes, and therefore, for purposes of calculating TBES' depreciation of the master tapes, the total principal amount of the promissory notes is not to be included in TBES' tax basis relating to the master tapes. See *Estate of Baron v. Commissioner*, 83 T.C. 542, 549 (1984), affd. 798 F.2d 65 (2d Cir. 1986).

In these circumstances and given the lack of arm's-length negotiations between petitioner and EAR, TBES' cost basis in each of the 125 master tapes that were purchased in 1982 and 1983 is limited to $5,000, the amount of cash required to be paid for each master tape, and the fair market value of each master tape. See *Bryant v. Commissioner*, 790 F.2d 1463, 1467 (9th Cir. 1986), affg. T.C. Memo. 1983–633; *Aero Warehouse Corp. v. Commissioner*, T.C. Memo. 1989–180, affd. without published opinion 902 F.2d 1558 (3d Cir. 1990).

Depreciation is allowed in the year qualifying property is placed in service by a taxpayer. Secs. 1.167(a)–10(b) and 1.167(a)–11(e)(1)(i), Income Tax Regs. Property is placed in service when it is "placed in a condition or state of readiness and availability for a specifically assigned function". Sec. 1.167(a)–11(e)(1)(i), Income Tax Regs.; see also *Piggly Wiggly Southern, Inc. v. Commissioner*, 84 T.C. 739, 745–746 (1985), affd. 803 F.2d 1572 (11th Cir. 1986).

For an asset to be "placed in service" for purposes of depreciation, it is not necessary that the property actually be used during the taxable year in the taxpayer's profit-motivated venture. *Waddell v. Commissioner, supra* at 898 (citing *Sears Oil Co. v. Commissioner*, 359 F.2d 191, 198 (2d Cir. 1966), affg. in part, revg. in part, and remanding T.C. Memo. 1965–39). It is sufficient that the property be available for use. *Id.*

Property held for lease to others is placed in service when it is first held out for lease. *Waddell v. Commissioner, supra* at 898 (citing *Helfand v. Commissioner*, T.C. Memo. 1984–102; *Riss & Co. v. Commissioner*, T.C. Memo. 1964–190).

Master recordings are placed in service when the recordings are first released for distribution and sale or are used in the taxpayer's trade or business or for the production of income. Rev. Rul. 79–285, 1979–2 C.B. 91. A master recording must be completed and be available for use before it can be placed in service. *Donahue v. Commissioner*, T.C. Memo. 1991–181, affd. without published opinion 959 F.2d 234 (6th

Cir. 1992), affd. sub nom. *Pasternak v. Commissioner,* 990 F.2d 893 (6th Cir. 1993).

Of the 125 master tapes that we have concluded were produced by EAR and purchased by TBES in 1982 and 1983, the evidence in this case is totally inadequate for us to determine or even to estimate which tapes were placed in service in 1982, as distinguished from 1983. We therefore conclude that none of the master tapes were placed in service in 1982 and that all 125 master tapes were placed in service in 1983.

The burden of proof is on petitioner to establish when the master tapes were actually placed in service. Rule 142(a). Petitioner has not offered credible substantiation from which we can establish when each master tape was completed and placed in service. We conclude that TBES is entitled to depreciation deductions with respect to the 125 master tapes beginning in 1983, based on a cost basis of $5,000 per master tape.

For the years before us on this issue, no depreciation is allowed with regard to the remaining 297 master tapes that were apparently eventually produced by TBES, but that we have concluded were not produced or placed in service in 1982 and 1983.

*Discharge of Indebtedness Income*

Under section 61(a)(12), gross income includes income from the discharge of indebtedness. With exceptions not here relevant, taxpayers generally realize discharge of indebtedness income by the purchase of their debt obligations at less than the principal amount. *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931); sec. 1.61–12(a), Income Tax Regs. The acquisition of outstanding indebtedness by a person related to the debtor is treated as an acquisition of indebtedness by the debtor. Sec. 108(e)(4); sec. 1.108–2(a), Income Tax Regs.

Respondent argues that, in either 1984 or 1985 (when petitioner acquired 100 percent of the stock of EAR and because EAR held at least 100 promissory notes executed by TBES with a principal amount of $195,000 each, for a total outstanding debt of at least $19,500,000), TBES should be treated as having realized discharge of indebtedness income in the amount of $19,500,000.

Petitioner argues that EAR is a corporation unrelated to TBES and that when he acquired 100 percent of EAR's outstanding stock, neither he nor TBES realized discharge of indebtedness income.

Because we have found that, for Federal income tax purposes, the $195,000 promissory notes are not valid, genuine indebtedness, we conclude that petitioner did not realize discharge of indebtedness income for either 1984 or 1985, with respect to the promissory notes. Under our analysis, there existed, with respect to the purported promissory notes, no genuine indebtedness from which TBES could be discharged.[3]

*Additions to Tax and Increased Interest*

For 1982 and 1983, respondent determined under section 6661 that petitioner is liable for additions to tax for substantial understatements of tax equal to 25 percent of the respective underpayments of tax attributable to the claimed depreciation deductions. In order for understatements of tax to be considered substantial, the amount of the understatements must exceed the greater of 10 percent of the taxes required to be shown on the Federal income tax returns or $5,000. Sec. 6661(b)(1)(A).

The amount of understatements is reduced to the extent that the understatements are attributable to items with respect to which the taxpayers' tax treatment of the items is or was supported by substantial authority. Sec. 6661(b)(2)(B).

On the facts of this case, we conclude that the August 16, 1988, District Court decision in petitioner's favor in the injunction proceedings constituted substantial authority for the depreciation deductions that were claimed on petitioner's 1982 and 1983 tax returns that he filed on December 21, 1988. Because petitioner was able to convince a Federal District Court judge that the master tapes had a value of at least $100,000 each, we conclude that petitioner is not liable for the additions to tax under section 6661. See sec. 1.6661–3(b)(2), Income Tax Regs., which expressly treats court cases as substantial authority.

---

[3] Respondent, on brief, appears to concede that TBES should not be treated as having realized discharge of indebtedness income to the extent we treat the promissory notes as not genuine indebtedness and to the extent that we do not include, for purposes of depreciation, the promissory notes in TBES' tax basis in the master tapes.

Respondent asserted the negligence additions to tax for 1981 through 1985 for the first time in the answer, and respondent therefore has the burden of proof with respect thereto. Rule 142(a).

In light of all the facts and circumstances of this case, including the resolution of the injunction proceedings in petitioner's favor, we conclude that for 1981 through 1985 petitioner is not liable for the negligence additions to tax.

For 1981 through 1985, respondent determined that petitioner is liable for increased interest under section 6621 with respect to the portion of his underpayments that is attributable to tax-motivated transactions. Among the types of transactions that are considered to be tax-motivated transactions are valuation overstatements where the value of the property, or the adjusted basis of the property, claimed on a return is 150 percent or more of the amount determined to be the correct amount of the valuation or adjusted basis. Secs. 6621(c)(3)(A)(i), 6659(c).

A deficiency, however, is not considered "attributable to" a taxpayer's overvaluation of property where an alternative ground for the deficiency is sustained and where the alternative ground (such as the failure to place property in service during the relevant year) does not qualify as a type of tax-motivated transaction. *Todd v. Commissioner,* 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).

With respect to 1981, 1984, and 1985 petitioner is not liable for increased interest under section 6621 because petitioner has not filed tax returns for those years and therefore there do not exist substantial understatements attributable to tax-motivated transactions. See secs. 6621(c) and (d), 6659(c). Respondent does not argue otherwise.

For purposes of calculating the depreciation deductions claimed on his 1982 and 1983 Federal income tax returns, petitioner claimed a $200,000 basis in each master tape—115 master tapes in 1982 and 308 master tapes in 1983. With regard to 1982, we have disallowed the depreciation claimed on two alternative grounds, one of which does not constitute a tax-motivated transaction (namely, petitioner's failure to establish that any master tapes were placed in service in 1982), and we therefore conclude that for 1982 petitioner is not liable for increased interest under section 6621(c). See *Todd v. Commissioner, supra.*

With regard to 1983, we have concluded that petitioner's proper tax basis in the 125 master tapes that we have found were placed in service in 1983 is $5,000 per tape. Valuation overstatements and thus tax-motivated transactions with regard thereto clearly exist, and petitioner is thus liable for the section 6621(c) addition to tax with respect to the portion of the 1983 tax deficiency attributable thereto.

With regard to the portion of the 1983 tax deficiency that is attributable to the depreciation claimed on the additional 183 master tapes that constitute the balance of the master tapes that petitioner claims existed and were placed in service in 1983, we have disallowed the depreciation claimed on two alternative grounds, one of which does not constitute a tax-motivated transaction (namely, petitioner's failure to establish that the 183 master tapes were placed in service in 1983), and we therefore conclude that petitioner is not liable for increased interest under section 6621(c) with regard thereto. See *Todd v. Commissioner, supra.*

For 1981 through 1985, respondent determined that petitioner is liable under section 6654 for failure to pay estimated taxes. For 1981 through 1984, under section 1.6654–1(a), Income Tax Regs., this addition to tax is mandatory. *Dodge v. Commissioner,* 96 T.C. 172, 183 (1991), affd. in part and revd. in part 981 F.2d 350 (8th Cir. 1992); *Grosshandler v. Commissioner,* 75 T.C. 1, 21 (1980); *Estate of Ruben v. Commissioner,* 33 T.C. 1071, 1072 (1960). Also, for 1985 the addition to tax under section 6654 is mandatory, unless the taxpayer falls within certain narrow exceptions not applicable in this case. Sec. 6654(e); Deficit Reduction Act of 1984, Pub. L. 98–369, sec. 414, 98 Stat. 793.

Petitioner did not make estimated tax payments for any of the years in issue. Since the addition to tax under section 6654(a) is mandatory for 1981 through 1984, and since petitioner has failed to establish that for 1985 he falls within one of the narrow exceptions under section 6654(e), we sustain the additions to tax under section 6654 for 1981 through 1985.

*Decision will be entered under Rule 155.*