**Charles DODGE; Christine Y. Roberts, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 92–1372.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 17, 1992.

Decided Dec. 9, 1992.

Rehearing Denied Jan. 20, 1993.

**352**

Eugene G. Sayre (argued), Little Rock, AR, for appellants.

Janet Kay Jones (argued), Gary R. Allen and Robert S. Pomerance, Washington, DC, appeared on the brief, for appellee.

Before BEAM, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

BEAM, Circuit Judge.

Charles Dodge and Christine Roberts jointly appeal a tax court judgment[1] holding them liable for back taxes and penalties. For reversal, appellants argue: 1) that the IRS assessment against them was a naked assessment not entitled to the presumption of correctness normally afforded IRS assessments; 2) that they identified a large percentage of the bank deposits as nontaxable, and therefore the burden of proof shifted to the IRS to show a taxable source for the disputed bank deposits—a burden the IRS failed to meet; 3) that the IRS failed to prove that Dodge's insurance proceeds were not excludable from gross income under 26 U.S.C. § 104(a)(3); 4) that the tax court clearly erred in finding the taxpayers had not proven the nontaxable source of some of the disputed deposits; and 5) that no penalties were assessable against them.

We affirm in part and reverse in part.

## I. BACKGROUND

Dodge and Roberts (the taxpayers) are retired and live together. Dodge is a veteran. He suffered from spinal meningitis in the 1960s, and receives veterans' disability benefits as a result of that illness. Dodge has previously been convicted of and imprisoned for tax violations and tax protesting activities. He is classified by the IRS as a tax protester. He and Roberts have maintained joint and separate accounts, and generally commingled their finances at least since 1981. In the fall of 1985 the IRS contacted Dodge about his failure to file income tax returns for the years of 1981 through 1984. Dodge claimed to be unable to provide the IRS with financial records because a fire had burned their house and, apparently, many of their financial records in January of 1984. As a consequence, the IRS used the indirect bank deposit method to reconstruct his income. Because the taxpayers' finances were commingled and because Roberts had reported very little taxable income, even though bank records showed approximately $700,000 moving through their various accounts, Roberts was also investigated. She too provided no records, and the indirect bank deposit method was used to reconstruct her income. The commingling of the taxpayers' funds resulted in Roberts' classification as a tax protester for the purposes of the investigation.

The taxpayers had revenue during the relevant four-year period from veterans' and social security benefits, oil royalties, pension payments, and insurance proceeds. There was evidence that funds were also generated through real estate and personal loans between the couple, their friends, and various banks. Dodge and Roberts additionally deal in precious stones, used cars, and jewelry as a serious "hobby." During the years in question, Dodge carried from thirty to sixty hospital indemnification policies (HIPs) which pay a fixed amount per hospitalized day. For most of the period, he was also insured by Blue Cross/Blue Shield. From 1981 through 1984, Dodge was hospitalized at least seven times, collecting nearly $258,000 from his HIPs and $5,124 from Blue Cross.

The IRS issued statutory notices of deficiency to both taxpayers in January of 1987. Working with the IRS, Roberts and Dodge were able to identify the source of

1. *Dodge v. Commissioner,* 96 T.C. 172 (1991).

many of their deposits before trial. The parties remained at odds about the taxability of the insurance proceeds Dodge had received due to the series of hospitalizations, about the identification of certain deposits, and about who had the burden of proof regarding the status of the unidentified deposits. After trial, the tax court found that Dodge's hospitalizations were not legitimate, that his health insurance claims were not made in good faith, and that he therefore could not exclude his insurance proceeds from gross income.[2] The tax court also assigned all revenue Dodge and Roberts could not show to have come from untaxable sources as gross income to either one or the other. Finally, the tax court agreed with the IRS that: 1) Dodge was liable for penalties under 26 U.S.C. § 6651(a)(1) for unreasonably failing to file returns for the period in question; 2) Dodge was liable for penalties under 26 U.S.C. § 6654 for failing to pay any estimated tax for the relevant period; 3) both taxpayers were liable for penalties under 26 U.S.C. § 6653(a)(1) and (2) for negligent underpayment of tax; and 4) both taxpayers were liable under 26 U.S.C. § 6661(a) for substantial understatement of income coupled with their failure to adequately disclose that income.

Dodge and Roberts appeal. We have jurisdiction under 26 U.S.C. § 7482.

## II.  DISCUSSION

### A.  *The Assessment*

■ "This court must accept the Commissioner's method of reconstructing income so long as it is rationally based." *Rowell v. Commissioner,* 884 F.2d 1085, 1087 (8th Cir.1989). However, a "naked assessment" made without any foundation whatsoever, or without some predicate supporting evidence, is not entitled to the presumption of correctness. *Portillo v. Commissioner,* 932 F.2d 1128, 1133 (5th Cir. 1991). When taxpayers fail to file returns or when they file returns substantially understating their income, and cannot pro-

duce records which provide the "[a]rithmetic precision ... originally and exclusively in [their] hands," an assessment is necessarily an estimate. *Rowell,* 884 F.2d at 1088. As long as the method for assessment is reasonable and logical, defaulting taxpayers may not complain of the inevitable inaccuracies in assessment their default occasions. *Id.* at 1087–88. Faced with nearly $700,000 deposited over a four-year period of time; no financial records; evidence pointing to an insurance speculation scheme; and no returns or returns reporting minimal income for the relevant period; the Commissioner had little choice but to use the indirect bank deposits method to reconstruct Dodge's and Roberts' income. We do not find the Commissioner's use of the indirect bank deposits method, under the circumstances, to be anything less than reasonable and rationally based.

■ The taxpayers' claims that the assessment constituted arbitrary and irrational action because it initially purposely included some funds subsequently determined to be nontaxable must also fail. Dodge was classified as a tax protester, had been recently convicted of criminal tax offenses, had filed no returns while depositing large sums over a four-year period, claimed to have lost all records, and was apparently generating large sums through loans and insurance proceeds. Under these circumstances, it was completely logical to include in the assessment some deposits which might prove not to be income. We do not find any arbitrariness or irrationality in the Commissioner's evident determination that something was amiss and that these sums most likely represented some form of actual income.

■ Nor does the inadvertent inclusion of some actually nontaxable deposits render the Commissioner's estimate a naked assessment. As noted, the assessment is intended to be an estimate. It is expected to be rational, not flawless. We note that after the initial assessment, the taxpayers and the Commissioner worked together

---

**2.** We understand the position of the IRS to be that Dodge may deduct the actual expenses of those hospitalizations which the tax court found

were not due to actual illness or injury from his gross income. We take no position on this issue.

over a period of several years to classify the deposits, and that the assessment was adjusted accordingly. The taxpayers' initial failure to provide this cooperation cannot now be used to attack the assessment as arbitrary.

■ The taxpayers also claim that the Commissioner acted arbitrarily and irrationally in assessing to both taxpayers the amounts held in joint accounts. Because the funds were commingled, it was rational for the Commissioner to assess the deposits as income to both parties. The taxpayers, not the Commissioner, were in a position to discern to whom the income should be assigned. It would have been irrational, and also unfair, to arbitrarily assign the joint funds to either Dodge or Roberts. The true owner would have no incentive to correct the situation, and the presumed owner would be at a disadvantage. By assigning the income to both account owners, the Commissioner avoided arbitrarily favoring one taxpayer over the other. The Commissioner thus assured that both taxpayers were equally positioned and motivated in their quest to show the Commissioner and, ultimately, the trier of fact, the source of the deposits and to whom they should be assigned.

### B. The Burden of Proof

■ Once the deposits were shown to be in the nature of income and to exceed what the taxpayers had reported as income, it became the taxpayers' responsibility to persuade the trier of fact that the deposits were nontaxable. *Calhoun v. United States*, 591 F.2d 1243, 1245 (9th Cir.1978), *cert. denied*, 439 U.S. 1118, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *Ruark v. Commissioner*, 449 F.2d 311, 312 (9th Cir. 1971). "Any other rule would burden the Government with investigating the many possible nontaxable sources of income . . . ,

a matter peculiarly within the knowledge of the defendant." *Zeeman v. United States*, 395 F.2d 861, 867 (2d Cir.1968). The taxpayers were afforded the opportunity to show the tax court the error of the Commissioner's ways. The taxpayers' ability to identify a substantial proportion of the deposits before trial did not remove the presumption of correctness from the Commissioner's assessment as to those deposits still unidentified or disputed, nor did it shift the burden of proof to the Commissioner as to the tax status of those remaining deposits. *See id.* at 866–67; *United States v. Stonehill*, 702 F.2d 1288, 1294 (9th Cir. 1983) (rebutting presumption of correctness as to several items of a multiple assessment does not affect the presumed correctness of the rest of the assessment, unless a pattern of arbitrariness is demonstrated), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1440, 79 L.Ed.2d 761 (1984). This result is especially appropriate in cases, such as this, where the Commissioner and tax court have classified a large portion of the belatedly identified deposits as taxable income.[3]

### C. The Hospital Indemnification Policy Proceeds

Dodge maintained an "insurance program" which consisted of carrying from thirty to sixty hospital indemnification policies (HIPs). HIPs are insurance policies which pay the insured a fixed rate per day of hospitalization, regardless of amounts paid by other insurance companies. HIPs are typically available through the mail, and require no medical screening. It is not illegal to carry a large number of HIP policies. It may, in fact, be highly desirable for those who are at high risk of debilitating diseases and who are otherwise uninsurable. In addition, most major medical insurance policies exclude payment for "experimental" treatments, which may be

---

**3.** We note the taxpayers also argue that the burden shifted to the Commissioner because of "increased" deficiency assessments against Dodge for 1983 and 1984. Under the tax court's rules, this would normally be true. Tax Court Rule 142(a). However, the increases in question resulted from income being deleted from Roberts' liabilities and added to Dodge's, with the consent of all parties. Joint Appendix at 88. Such an adjustment has no relation to the genesis of the deposits, and as such, had no effect on the burden of proof. A further stipulation of an arithmetic mistake resulted in Dodge's other "increase." Joint Appendix at 95. Likewise, this was not an increase in assessment which affected the burden of proof.

the only hope for survival of a seriously ill person and which are often extremely expensive. Thus, even a person with traditional insurance might deem it prudent to carry a number of HIPs to cover the deductibles and exclusions of traditional insurance.

■ Under 26 U.S.C. § 104(a)(3) "amounts received through accident or health insurance for personal injuries or sickness" are excluded from income. This exclusion has been interpreted to apply to all health or accident insurance benefits received by the taxpayer to combat the ravages of diseases or accidents. *Epmeier v. United States*, 199 F.2d 508, 511 (7th Cir.1952); Rev.Rul. 69–154, 1969–1 C.B. 46; Rev.Rul. 58–602, 1958–2 C.B. 109, as modified by Rev.Rul. 68–212, 1968–1 C.B. 91. The taxpayer has the burden of proving that questioned proceeds fall within the exclusion.[4] Tax Court Rule 142. As the tax court correctly noted, personal injury or sickness, not hospitalizations or the receipt of insurance benefits, trigger the statutory exclusion.

We recognize the merit of the taxpayers' argument that the Commissioner should not be added to the proliferating ranks of nonprofessionals attempting to insert themselves into the doctor-patient relationship and to define appropriate care. However, when the evidence establishes that the taxpayer's claims for insurance benefits are not based on *any* actual sickness or injury, we find the Commissioner's categorization of those benefits as income to be correct. This is not to say that we would uphold a determination that insurance benefits received for an actual personal injury or sickness were income where the Commissioner merely disagreed with the appropriateness of the medical care given or considered the taxpayer to be overinsured.

■ We review the tax court's finding of fact under the clearly erroneous standard. *Hinckley v. Commissioner*, 410 F.2d 937 (8th Cir.1969).[5] Under the clearly erroneous standard of review, we will uphold a finding unless, despite there being evidence in the record to support it, we are left with a "definite and firm conviction that a mistake has been made." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The tax court found Dodge's "insurance program" to be his major source of income. During the relevant period, he carried Blue Cross/Blue Shield and thirty to sixty HIP policies. He fit the profile of an "insurance speculator," that is someone who purchases multiple HIPs and then seeks "friendly" doctors to admit him or her into a hospital on the basis of hard to diagnose head, neck, back, and soft tissue injuries. Dodge was hospitalized seven times during the 1981 through 1984 period in question, almost exclusively for back and neck pain after alleged falls.[6]

■ Six of Dodge's seven hospitalizations were for neck and back pain. Four admissions were by a physician who was a close personal friend and to whom the taxpayers had lent $50,000, sold an automobile, and sold jewelry. One admission was by a physician who was involved with Dodge in real estate investment, and in that hospitalization Dodge decided his own release date. One admission was after Dodge purportedly fell off a lawn mower in Arkansas and then flew to California for treatment. The tax court found Dodge's physician's and Dodge's own testimony regarding his injuries to be flatly incredible. A number of Dodge's HIP carriers successfully negotiated with Dodge to cancel their coverage after they discovered the amount of insurance he carried. Blue Cross/Blue

**4.** We note that the taxpayers attempt to argue that the Commissioner had the burden of proving that Dodge's HIP proceeds were not within the statutory exclusion. This assertion is contrary to settled law. Tax Court Rule 142(a).

**5.** Contrary to the taxpayers' assertion, *Campbell County State Bank, Inc. v. Commissioner*, 311 F.2d 374, 377 (8th Cir.1963), does not recognize exceptions to the clearly erroneous standard of

review as applied to factual decisions of the tax court. The decision merely explains how the standard is applied in practice. *Id.* at 377, 379.

**6.** We note that the record shows Dodge continued to be frequently hospitalized after purported falls in the years following 1984. Joint Appendix at 214.

Shield denied Dodge reimbursement for a large portion of his expenses as medically inappropriate. The postal authorities also investigated Dodge's insurance activities. In view of this record, the tax court did not clearly err in its determination that six of these hospitalizations, and the resultant insurance proceeds, were not related to actual sickness or injuries. Therefore the tax court's classification of those proceeds as outside of the statutory exclusion is correct as to six of the seven hospitalizations.

█ However, even "insurance speculators" may suffer legitimate or catastrophic illnesses; when that occurs section 104(a)(3) operates to exclude the benefits they receive due to illness or personal injury, just as it would for any other taxpayer. That the benefits may exceed the taxpayer's actual immediate medical expenses is of no consequence under the plain language of the statute, so long as the illness is genuine. The taxpayer may well need the benefits for future expenses major medical insurance will not cover, or for living and home care expenses while incapacitated. To the extent the Commissioner asserts that benefits received in excess of actual medical expenses are not excluded from income by section 104(a)(3), we disagree. The plain language of the statute excludes all "amounts received through accident or health insurance for personal injuries or sickness." 26 U.S.C. § 104(a)(3). Since Congress did not limit the exclusion

to actual expenditures when writing the statute, we will not do so in Congress's stead.[7]

█ The tax court did not interpret the statute otherwise, but grounded its rulings against Dodge on its factual finding that Dodge had not suffered any legitimate illness or injury. As noted above, we do not find those rulings to be clearly erroneous for six of Dodge's hospitalizations. However, the seventh hospitalization, for a perforated colon, evidently a side effect of a biopsy performed in anticipation of a hemorrhoidectomy, is clearly the result of an actual illness or accident. Even if the tax court chose not to credit the testimony of Dodge's physician, which is its prerogative, Dodge's hospital and medical bills verify that he underwent the surgery. Joint Appendix 529–38. This leads us to the definite and firm conviction that the tax court made a mistake in finding no legitimate illness or injury triggered this hospitalization, and that the Commissioner was unreasonable to assert otherwise. Accordingly, the tax court clearly erred in not excluding from the taxpayers' income those amounts Dodge received from health or accident insurance due to the biopsy, perforation, and surgery underlying the May and June 1982 hospitalization. This error does not affect the validity of the rest of the assessment. *Stonehill,* 702 F.2d at 1294.

7. The purpose of the statute, as well as its plain language, supports our interpretation. The ravages of disease and accident are not confined to the medical expenses of the moment, but may stretch into months or years. The need for expensive and/or experimental treatment (which major medical policies routinely exclude) may arise long after the event triggering benefits, and long after the taxpayer has lost any previous medical coverage or the ability to be gainfully employed. These are the concerns which support the statutory exclusion of benefits occasioned by accident or illness from income. *See Epmeier,* 199 F.2d at 508. These are also the concerns motivating most taxpayers who purchase multiple HIPs.

   For example, the Insurance Commission of the taxpayers' state recommends that people at risk for serious prolonged illnesses such as AIDS or cancer purchase multiple HIP policies. Joint Appendix at 116–118, 128 (testimony of assistant insurance commissioner). Such high

risk people cannot predict which illness will be the catastrophic one that permanently removes them from the work force, or which will be the one that requires experimental treatment. They therefore cannot predict when they should start carrying more HIP coverage to provide them with funds for the long uncertain period ahead. Joint Appendix at 116–118. Neither can the average taxpayer predict when he or she will unexpectedly suffer a catastrophic health problem. *Id.* Nor can the IRS Commissioner make any sort of reliable finding as to when the ravages of illness are finally over, or when the taxpayer may be sure to incur no more expenses due to a particular illness, rendering any benefits received beyond that level a pure windfall. For these reasons, as well as the statute's plain language, we interpret the statute literally to exclude from income all amounts "received through accident or health insurance for personal injuries or sickness."

D. *Identification of Other Questioned Deposits.*

Since these disputed deposits have the nature of income, the burden was on the taxpayers to show whether and to what extent they derived from nontaxable sources. *See Calhoun*, 591 F.2d at 1245; *Ruark*, 449 F.2d at 312. The taxpayers claim that they have shown the source and nature of some of these deposits, and that the tax court erroneously failed to adjust the assessment to that extent. We review the tax court's determination that the taxpayers failed to adequately identify the disputed deposits under the clearly erroneous standard. *Hinckley*, 410 F.2d at 937.

■ One of the principal disputes in this category is a $50,000 loan between the taxpayers and their primary physician. The tax court explicitly recognized the existence of the loan, and relied on the existence of the loan between the taxpayers and Dodge's physician to discredit Dodge's hospitalizations. *Dodge*, 96 T.C. at 177. Having relied, to the taxpayers' detriment, on oral testimony that they borrowed $50,000 from a credit union to fund a handshake loan to Dodge's physician, the tax court may not ignore the clear evidence that ten subsequent monthly checks of $1,000 from the physician to the taxpayers, and the $45,000 dollar lump sum which followed, were in repayment of the loan. Joint Appendix at 1273, 1299–1300. To find otherwise is unreasonable, and against the clear weight of the evidence. The tax court's finding on this issue is therefore clearly erroneous. *See Campbell County State Bank, Inc. v. Commissioner*, 311 F.2d 374, 377 (8th Cir.1963). Of course, the funds the physician admittedly paid Dodge and Roberts for an engagement ring and an automobile are not within the parameters of the repayment of the loan, and the taxpayers do not claim otherwise.

We are cognizant that a taxpayer without records or returns may not insist on arithmetic precision, but when the tax court finds that certain deposits were generated by sales of automobiles and jewelry, and also determines a basis for those items, the assessment must be adjusted accord-

ingly. *Dodge*, 96 T.C. at 174–75, 182. Although the taxpayers complain that the tax court's ruling will result in their being taxed doubly for those items, we are confident that when the tax court assigned the proceeds from the taxpayers' sales of vehicles and jewelry to their respective tax liabilities, *id.* at 182, it intended that the Commissioner adjust the assessment as to those items where both a sale price and a basis had been found, *id.* at 174–75, to reflect the net income to the taxpayers. We are likewise confident that the Commissioner will comply with the tax court's evident intent.

The taxpayers argue strongly that they presented adequate evidence to show that several more of the disputed deposits were loan substitutions and thus not taxable. However, we do not find, on the record before us, that the tax court clearly erred in finding the taxpayers failed to meet their burden of proof as to the rest of the disputed deposits. *See Stonehill*, 702 F.2d at 1294.

E. *Penalties*

The tax court imposed penalties on Dodge for failing to file Federal income tax returns without reasonable cause under 26 U.S.C. § 6651(a)(1) and failing to pay estimated income tax under 26 § U.S.C. 6654. Penalties were imposed on both Dodge and Roberts under 26 U.S.C. § 6653(a)(1) and (2) for negligently underpaying their taxes, and under 26 U.S.C. § 6661(a) for substantially understating their income with no substantial authority for their tax treatment of the item resulting in the understatement.

We concur with the tax court's well-reasoned application of these penalties, and see no need to repeat it here. We therefore affirm these penalties, which are to be applied after the taxpayers' underlying tax liability has been adjusted in accordance with this opinion.

III. CONCLUSION

For the reasons stated above, we affirm the tax court's decision, except with respect to benefits received due to Dodge's hospi-

**358**

talization for a perforated colon and hemorrhoidectomy, and with respect to the classification of the repayment of the taxpayers' $50,000 loan to their physician as taxable income. As to those two items, we reverse and remand for further proceedings not inconsistent with this opinion. The penalties imposed are affirmed, and are to be applied after recalculation of the taxpayers' underlying tax liability in conformance with this opinion.