**UNITED STATES of America, Plaintiff,**

v.

**Lyle R. FLETCHALL, et al., Defendants.**

**No. C 89–3047–DEO.**

United States District Court,
N.D. Iowa,
Central Division.

Aug. 5, 1997.

---

3. Doc. # 6.

4. Doc. # 14.

Dennis M. Duffy, U.S. Dept. of Justice, Washington DC, for plaintiff.

Lyle R. Fletchall, pro se.

## ORDER

DONALD E. O'BRIEN, Senior District Judge.

This matter comes before the Court to determine the amount of back taxes and penalties, if any, owed by the defendants Lyle and Doris Fletchall. The Government contends the defendants owe taxes and penalties for the tax years 1977, 1978, and 1979, and just taxes for tax year 1983. The defendants contend that they owe no taxes or penalties for those years. The Court held a bench trial in which both the plaintiff and the defendants called a number of witnesses. After careful consideration of the parties' and the witnesses' testimony, the documentary evidence, and the relevant case and statutory law, the Court is persuaded that the defendants do owe substantial back taxes and penalties.

### I. BACKGROUND

This case is the story of Lyle and Doris Fletchall, a husband and wife team who were major players in the environmental engineering field during its boom years, the late 1970s and early 1980s. It cannot be said that the sun never set on the Fletchalls' empire, but at the height of their success, the couple had branched out from Fort Dodge, Iowa, and controlled environmental engineering firms in locations from Iowa to Nebraska to Kansas to Texas. Fueled by the proliferation of federal, state and local government construction contracts and the attendant need for environmental engineering services, the Fletchalls found themselves flush with cash at the dawn of the 1980s. As quickly as the Fletchalls reached the pinnacle of business success, however, three factors converged to knock the couple from their lofty perch.

The first factor which contributed to the Fletchalls' downfall was their decision to pursue a plan of very aggressive expansion. Having seen the rewards and profits one could reap from a single, successful firm, the Fletchalls decided that owning two firms would be twice as good and owning four firms would be even better. In the rush to acquire new firms, the Fletchalls purchased existing engineering firms too quickly and, in

hind sight at least, did not give proper consideration to what constituted a fair price for a particular firm's assets and liabilities. Instead, the Fletchalls banked on the premise that their managerial expertise and a healthy economy would generate ever increasing streams of revenue. When the healthy economy failed, no amount of managerial expertise could save the Fletchalls' corporations.

The second factor which laid the groundwork for the Fletchalls' demise, and the one to which the Fletchalls attribute the most significance, was the simultaneous decision of local, state and federal governments to let out for bid substantially fewer environmental engineering projects than they had in previous years. Accustomed to there being more contracts available than they could ever bid on, and being able to win more contracts than they ever complete, suddenly the Fletchalls and their businesses, Associated Engineers, Inc. of Iowa (AEI–Iowa) and AEI–Iowa's sister firms (AEI–Kansas, AEI–Texas, and AEI–Nebraska), struggled to find work at all.[1]

The third factor which led to the Fletchalls' downfall, and the factor to which the Court attributes particular significance, is the Fletchalls' decision (in response to the two factors above) to pay less federal income taxes than they legitimately owed. This at first was because of case flow, i.e., not being promptly paid on some jobs, and, when business dried up, there not being enough jobs. The Fletchalls failed to report income of various origins and took advantage of a variety of improper deductions, exemptions and tax credits. The end result of these omissions and mistakes was that the Fletchalls avoided paying hundreds of thousands of dollars of taxes they owed. A subsequent Government investigation resulted in two criminal pleas (Lyle's and Doris's), seemingly endless civil litigation, and culminated in the recent trial in Fort Dodge. This more than any other factor led to the collapse of AEI–Iowa, its sister firms, and the Fletchalls' personal finances.

## II. LEGAL ANALYSIS

It is well settled that the Internal Revenue Service is entitled to a rebuttable presumption that its income tax assignments are correct. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *see also Caulfield v. Commissioner*, 33 F.3d 991, 993 (8th Cir.1994). For that reason, the taxpayer bears the burden of proving that the IRS's assessment is arbitrary or erroneous. *Day v. Commissioner*, 975 F.2d 534, 537 (8th Cir.1992). "Any other rule would burden the Government with investigating the many possible nontaxable sources of income ... a matter peculiarly within the knowledge of the defendant." *Dodge v. Commissioner*, 981 F.2d 350, 354 (8th Cir. 1992) (citing *Zeeman v. United States*, 395 F.2d 861, 867 (2d Cir.1968)). The presumption in favor of the Government fails, however, if it is made without any foundation or supporting evidence. *Page v. Commissioner*, 58 F.3d 1342, 1347 (8th Cir.1995). Finally, even if the presumption in favor of a portion of the Service's assessment is rebutted, that does not affect the presumed correctness of the rest of the assessment. *Dodge*, 981 F.2d at 354 (citing *United States v. Stonehill*, 702 F.2d 1288, 1294 (9th Cir.1983)).

## A. SELECTED MISTAKES, OMISSIONS AND OTHER IRREGULARITIES IN TAX YEARS 1977, 1978 AND 1979

In this case, the Government presented a vast array of exhibits and witnesses which showed that the Fletchalls engaged in an intentional and systematic plan to underpay their federal income taxes for the tax years 1977, 1978, and 1979. The Government also presented evidence that the Fletchalls underreported their tax obligation for the 1983 tax year. Calculating the tax obligations in this case involves evaluating tens, if not hundreds, of adjustments the Government proposes to make to the Fletchalls' tax returns for the years in question. All of the adjust-

---

1. Lyle Fletchall was the primary owner of AEI–Iowa and its sister firms. Lyle Fletchall owned approximately 95% of the stock in the different AEI corporations and partnerships; Lyle's partner Herb Ohrt owned the other 5% of the stock.

Testimony at trial showed that Doris Fletchall made many upper-level management decisions for AEI–Iowa, although she had no ownership interest in AEI–Iowa or any of the other AEI companies.

ments for tax years 1977–79 are summarized in the Government's exhibit 1–5(f). The Government's proposed adjustments can be divided into fifteen different categories. Of these fifteen categories, five provide the bulk of the Government's adjustments: (1) concealed interest income; (2) concealed payments to Doris Fletchall; (3) concealed rental income; (4) understatement of pass-through income from AEI–Iowa; and (5) overstatement of exemptions. Because the Government is entitled to the rebuttable presumption that its assessments are correct, the most logical approach to writing this order is to review the adjustments to the Fletchalls's income tax returns for the years in question listed in Government's Exhibit 1–5(f) and the bases for the adjustments. After reviewing each adjustment, the Court will review the Fletchalls' objections to that particular adjustment.

### 1. CONCEALED INTEREST INCOME

■ With respect to the first major category, concealed interest income, the Government presented exhibit 5–3, a signature card from a savings account (# 221572) belonging to Doris Fletchall at the First American State Bank of Fort Dodge. The account was opened in 1973. Exhibits 3–14, 3–15, 5–19, 5–20, and 5–21 were deposit and withdrawal slips from this account. Exhibits 5–6, 6–2 and 7–2 were financial statements Lyle Fletchall prepared in order to secure loans and show that during 1978 and 1979 he had knowledge that account # 221572 existed. Doris Fletchall deposited income into this account from a variety of sources, such as income from work she performed for AEI–Iowa and rental income from the buildings she owned that AEI–Iowa and others rented from her. *See* exhibits 3–14, 3–15 and 5–19. In the years 1977–79, Doris Fletchall earned $973.20, $2630.61, and 3110.95, respectively, on interest from her savings account at the First American State Bank. *See* exhibits 5–19 at 21, 5–20 at 8, 5–21 at 1. The Fletchalls did not report any of this interest income. *See* exhibits 1–1 at 8, 1–2 at 6, and 1–3 at 8 (the Fletchalls' 1977, 1978, and 1979 tax returns, respectively). Together these adjustments for unreported interest income total $6714.76.

The Fletchalls did not dispute that they failed to report this interest income on their income tax returns. Their only defense was that they forgot about it. As shown above, however, the Fletchalls clearly knew this bank account existed. The only reasonable conclusion the Court can reach is that the Fletchalls intentionally failed to report this interest income. In fact, Lyle Fletchall acknowledged in his criminal case plea agreement that, among other deceptive practices, he failed to report interest income from account # 221572 during the 1979 tax year.

### 2. CONCEALED PAYMENTS TO DORIS FLETCHALL

■ Doris Fletchall worked full time for AEI–Iowa from 1977–79. Testimony of numerous witnesses including Doris Fletchall clearly showed this. She was treated in the company books as an independent contractor for employment payroll tax purposes, i.e., AEI–Iowa did not pay one-half of Doris's payroll taxes. This would not have been a problem if Doris had reported these payments from AEI–Iowa as income on her's and Lyle's joint tax returns and paid both the employee and employee's share of the payroll taxes on her income. Exhibits 1–1, 1–2, and 1–3 (the Fletchalls 1977–79 tax returns), however, show that the Fletchalls neither reported Doris's income from AEI–Iowa on their joint tax returns, nor paid Doris's payroll taxes that were due on her income during those three years. The Government provided a summary of the compensation Doris earned during 1977 in exhibit 4–32. This exhibit corresponded to the paychecks Doris received which were contained in exhibit 4–31. Exhibit 4–32 contained such information as the manner in which Doris disposed of her paycheck, the date Doris disposed of her paycheck, the manner in which AEI characterized Doris's paycheck. Exhibit 4–33 contains similar information for the paychecks Doris received in 1978 and exhibit 4–35 contains a summary of the paychecks Doris received in 1979.

Exhibits 4–35 and 4–7(a) show that AEI characterized the wages it paid to Doris as "services purchased" in 1977 and 1979. AEI took a deduction for these entries. For

whatever reason, AEI did not characterize Doris's payments as "services purchased" in 1978 and did not deduct them from its gross profits. When the IRS prepared its adjustments it allowed AEI a deduction for income paid to Doris in 1978. AEI's records showed that it made payments to Doris in compensation for her work at AEI in the amount of $15,900, $19,200 and $22,242.11 in the years 1977, 1978 and 1979, respectively. The Fletchalls owe both the employer's and the employee's side of payroll taxes for tax years 1977–79, regardless of whether or not AEI–Iowa deducted Doris Fletchall's wages. The three-year total of unreported income paid to Doris on which the Fletchalls's joint return should have paid both self-employment tax and income tax is $57,342.11.

At trial, the Fletchalls argued they did not owe taxes on the wages paid to Doris because they were paid out of Lyle's retained earnings, i.e., money earned by AEI–Iowa which, because AEI–Iowa was a Subchapter S corporation, was reported as income on the Fletchalls' joint tax return. Because they had already paid income taxes on Lyle's income from AEI–Iowa, they argued, they need not pay if the money was transferred from Lyle to Doris. This argument ignored two important facts. First, with respect to Doris's wages from 1977 and 1979, because these wages were deducted from AEI–Iowa's gross profits, neither Lyle nor Doris ever paid any taxes on those wages. Second, with respect to the wages from 1978, because payroll taxes are not charged on income above a certain level, and because Lyle's income was above that level, any money transferred from Lyle to cover Doris's wages was money on which Lyle had not paid payroll taxes. Thus, under both of the Fletchalls' methods of accounting, Doris drew a salary free of payroll taxes during the three years in question.

### 3. CONCEALED RENTAL INCOME RECEIVED BY THE FLETCHALLS

Doris and Lyle Fletchall received income in the form of rental payments from four properties during tax years 1977–79.[2] The first property was owned jointly by Doris and Lyle and was leased to AEI–Iowa for use as its corporate headquarters. *See* exhibits 4–49, 4–51, 4–53. The Government produced exhibits 1–1, at 5, and 1–2, at 9 (the Fletchalls' 1977 and 1978 tax returns, respectively), which, when compared to exhibits 4–49 and 4–51, showed that the Fletchalls underreported the income they received from this property by $3300 during tax year 1977 and by $8000 during 1978.

The second property was leased to AEI–Kansas for use as its headquarters and was owned solely by Doris. The Government produced exhibits 4–36, 4–41 and 4–42, which, when compared to exhibit 1–1, at 5 (the Fletchalls' 1977 tax return), showed that the Fletchalls underreported their income on this building by $2500 in 1977.

The third property was a parking lot owned by Doris which she rented to AEI–Iowa. The Government produced exhibits 4–50, 4–52 and 4–54, which, when compared to exhibits 1–1, at 5; 1–2, at 9; and 1–3 at 11 (the Fletchalls' 1977–79 tax returns); showed that Doris underreported her income from the parking lot by $3600, $3600, and $5437 in 1977–79, respectively.

The fourth property was a commercial building in Fort Dodge rented by Brownies restaurant. The Government produced exhibits 4–55, 4–56, and 4–57, which, when compared to exhibits 1–1, at 5; 1–2, at 9; and 1–3 at 11 (the Fletchalls' 1977–79 tax returns); showed that Doris underreported her income from the commercial space leased to Brownies by $2520, $2560, and $2560 in 1977–79, respectively. The Fletchalls did not report any income from either the parking lot or the commercial space on their 1977–79 tax returns. *See* exhibits 1–1, 1–2, 1–3 (the Fletchalls' 1977–79 tax returns). Instead, Doris deposited these rental payments, along with her unreported income from AEI–Iowa, in her savings account at the First American

---

**2.** The Government believes the Fletchalls concealed additional rental income from wholly different properties they fraudulently transferred to their daughters. As the fraudulent transfer issue has yet to be tried, the Court instructed the Government to not include the rental income from the disputed properties in their assessments. The Government complied.

State Bank of Fort Dodge. At trial, the Fletchalls did not offer any credible explanation for their failure to report their substantial rental incomes during these years.

Government exhibit 3–3 compiles all of the rental income adjustments that need to be made to the Fletchalls' 1977, 1978 and 1979, income tax returns to make them conform with the proper income accounting procedures. After subtracting the disputed properties (as directed by the Court) which the Government contends the Fletchalls fraudulently transferred to their daughters Vicki and Valli Jo, the total adjustments to the Fletchalls' taxes amount to $12,320 in 1977; $15,169 in 1978; and $8207 in 1979. Exhibit 1–5(f), line 4.

### 4. PASS–THROUGH INCOME EARNED BY AEI

■■■ As mentioned earlier, AEI–Iowa purchased a number of other engineering firms in the late 1970s. The firms that were based in Iowa were folded into AEI–Iowa and the firms based in other states were renamed, for example, AEI–Kansas, or AEI–Texas. Because all of the AEI organizations were incorporated as Subchapter S corporations of which Lyle Fletchall owned approximately 95% of the outstanding stock, the Fletchalls were required to pay income taxes on the income Lyle Fletchall realized as a result of his corporate ownership. · *See Broadaway v. Commissioner,* 111 F.3d 593, 595 (8th Cir.1997) ("Under Subchapter S, the Company does not pay corporate-level income taxes. Instead, the Company's income is taxed directly to its shareholders based on their ownership of corporate stock."). This type of income is called pass-through income, because it passes through the corporation untaxed and comes to rest on the individual income tax returns of the owner(s) of the Subchapter S corporation who must then pay individual income tax on the income.

Most of the pass-through income the Government alleges the Fletchalls owe can be attributed to AEI–Iowa's decision to record the purchase of the companies they acquired as "services purchased" rather than as the acquisition of capital assets. By treating the companies as "services purchased" or "ordi-

nary and necessary business expenses," AEI was deducting the cost of purchasing the companies immediately. *See* 26 U.S.C. §§ 162, 263 (1997). Had AEI treated the purchase of the companies as the purchase of capital assets to be used for more than one year, it would not have been able to deduct their cost at all. *Id.* Because AEI was a Subchapter S corporation whose income passed through to the Fletchalls' individual income tax return, a deduction from AEI–Iowa's books was also a deduction from the Fletchalls' individual income tax return. The only problem with the Fletchalls' tax strategy is that Internal Revenue Section of the United States Code makes it clear that the purchase of an ongoing business is to be treated as a capital asset and not as an ordinary and necessary business expense. 26 U.S.C. §§ 162, 263 (1997).

The Fletchalls elected to take this improper deduction on a number of occasions. In 1977, AEI–Iowa acquired Caspar & Associates in Junction City, Kansas, for a price of $230,000. *See* exhibit 5–9. Rather than treat Caspar as a capital asset, AEI–Iowa expensed the transaction on its books as "services purchased." *See* exhibits 4–3; 4–3(a) at 120; 3–6. Subsequent to the transaction Caspar (which became known as AEI–Kansas after the purchase) returned $91,802.48 to AEI. AEI recorded this return on its books by deducting it from the $230,000 in services purchased. As a result AEI–Iowa's improper reduction on this purchase was only $138,197.52.

In late 1979, AEI–Iowa acquired McElya Engineering in Dallas, Texas, for $131,000. The initial check for McElya was written on the Fletchalls' personal checking account, but AEI–Iowa later reimbursed the Fletchalls for the purchase. Although the check was originally entered into AEI–Iowa's books as a "salary and expense advance," on December 31, 1979, Doris Fletchall instructed AEI–Iowa's accountants to reclassify the payment as two separate transactions: $100,000 for "services purchased" and $31,000 for the purchase of a "company vehicle." *See* exhibits 4–6, 4–6(a) at 63, and 13 respectively. After this financial restructuring, AEI deducted only the $100,000 for the newly classified

"services purchased." The IRS did not object to AEI–Iowa's tax treatment of the company vehicle, but it did disallow the $100,000 "services purchased" deduction.

Also in 1979, Lyle Fletchall and AEI–Iowa both put money into the stock purchase of McMahon, Mannik & Schneider in Kansas City, Missouri. AEI–Iowa paid $180,000 and Lyle Fletchall paid $121,509. AEI–Iowa did not deduct this expense. Later, AEI–Iowa reimbursed Lyle Fletchall for his payment. Initially, AEI–Iowa treated the reimbursement as "salary and expense advance." *See* exhibits 4–7, 4–7(a) at 68, 4–6, and 4–6(a) at 11. On December 31, 1979, however, Doris Fletchall instructed AEI–Iowa's accountants to change the treatment of Lyle's reimbursement to "services purchased" and subsequently deducted this payment. *See* exhibits 4–6, 4–6(a) at 62, and 13–2. Even though Doris Fletchall believed she had hit upon an ingenious accounting procedure to allow her to treat the purchase of an ongoing business as a fully-deductible payment to an independent contractor, the IRS disallowed this treatment of the reimbursement. Taken together, the IRS disallowed $221,509 in deductions that AEI–Iowa took in 1979 for the McElya and McMahon purchases.

■ The Fletchalls also decreased their pass-through income by taking a deduction for the cost of constructing a second floor on, and making other improvements to, its corporate headquarters building in Fort Dodge which was owned by Doris Fletchall. All of these capital improvements were made in 1979 and totaled $97,904. *See* exhibit 13–2, at 6–8. The Fletchalls claimed that the cost of these improvements was deductible because they were made to a building that AEI–Iowa leased, and because AEI–Iowa's lease with Doris expired less that one year after the improvements were made. In making this claim, the Fletchalls rely on 26 U.S.C. § 162(a)(3) which provides that a taxpayer is allowed a deduction for "rental or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of

property to which the taxpayer has not taken or is not taking title or in which he has no equity."

The Government argues the Fletchalls' reliance on § 162(a)(3) is misplaced because, even though AEI–Iowa's lease expired in 1979, AEI–Iowa renewed the lease with Doris as soon as it expired.[3] The Government argues that since the owner of AEI–Iowa's corporate headquarters was Doris Fletchall, it was inconceivable that Doris Fletchall would choose not to renew AEI–Iowa's lease when AEI–Iowa was paying her a substantial sum to rent the building each year. The Government's argument is persuasive. As early as 1960, it was determined that, if a taxpayer makes leasehold improvements on property he owns and subsequently his lease expires, he cannot deduct the entire cost of the leasehold improvements if he chooses to renew his lease on the property he improved. *Glenn–Minnich Clothing Co., Inc. v. Commissioner*, 1960 WL 948, 60 T.C. 207 (1960). Rather, he must amortize the cost of the improvements over their useful life, for example ten years. *Id.* The fact that Doris Fletchall owned the headquarters building only makes the Government's argument stronger. For this reason, the Court must deny AEI–Iowa's (and the Fletchalls') reliance on § 162(a)(3) as a means of immediately deducting the $97,904 in leasehold improvements AEI–Iowa made to its corporate headquarters in 1979.

■ In addition to improperly taking deductions for leasehold improvements in one lump sum in 1979, that same year the Fletchalls and AEI–Iowa also took deductions for other items which they did not receive or pay for until the following year, 1980. The Fletchalls amortized these deductions, however, so that they only deducted a portion of these items' cost. When Doris Fletchall was criminally prosecuted and convicted, as part of her plea agreement she admitted instructing AEI–Iowa accountants to take full-year deductions for items not yet paid for or received and which she knew were improper. *See* exhibits 25–1, 25–2 (Doris Fletchall's in-

---

**3.** In fact, on April 15, 1980, when AEI (and the Fletchalls) took the $97,904 deduction on the Fletchalls' joint tax return, AEI had already re-

newed its release with Doris Fletchall and was continuing to occupy its corporate headquarters in Fort Dodge.

dictment and plea agreement). These deductions involved a Wang computer system which was not received or paid for until some time in 1980, and a number of cars and trucks used in AEI–Iowa's business that were also not received or paid for until some time in 1980. Both the vehicles and the computer system were amortized and deducted in 1979. The checks for the vehicles were actually written in 1980, but were predated to appear as if they were written on December 31, 1979. *See* exhibits 21–1 (purchase agreements and billing invoices for Wang computer system); 4–29 (payment for computer); 3–20 (listing of vehicles depreciated in 1979); 4–67, 4–68, 4–69 (analyses of improper deductions on vehicles during 1979); 4–70 (analysis of improper computer system deductions), and 1–3 (Fletchalls' 1979 tax return showing deductions). In total, the improper deductions on the vehicles and the computer system amounted to $27,276.29.

■ The Fletchalls argued at trial that AEI–Iowa expensed items before they arrived or were paid for because AEI–Iowa's founder, Mr. Murrary, had always kept the books using that method. As it turns out, Mr. Murrary was a farmer and the tax code allows certain farm purchases to be expensed early. This provides an explanation of AEI–Iowa's unusual accounting methods, but not an excuse or justification. Moreover, AEI–Iowa's former accountants both testified they were unaware that farm purchases could be expensed early, and would not have expensed the computer system and the vehicles early unless they had been instructed to do so by Doris Fletchall, which they testified they were.

### 5. EXTRA EXEMPTIONS TAKEN BY THE FLETCHALLS

■ The Fletchalls claimed eight personal exemptions on their 1979 tax return, one for each of them and one for each of their six children. During the trial, the Fletchalls testified that their daughter Vicki had married and moved to Boone, Iowa, with her husband in 1979, and that their daughter Valli Jo attended Iowa State University in Ames, Iowa, through mid-1979 and, upon graduating from ISU, moved to Dallas, Tex-

as. Because neither Vicki nor Valli Jo lived with the Fletchalls during the 1979 tax year, the Fletchalls were not entitled to claim them as dependents on their 1979 tax return.

The Court has described in detail many of the ways in which the Fletchalls minimized their pass-through income from the various AEI corporations during the 1977–79 tax years. These were not the only ways in which the Fletchalls limited their pass-through income coming from these corporations. The Government's summation of the adjustments that need to be made to the various AEI corporations' reported taxes due so that they match their actual taxes due is shown at exhibit 1–5(f), lines 4–7.

As shown on exhibit 1–5(f), the sum of $276,958 must be added to AEI-*Iowa*'s income in 1977; $78,527.77 in 1978, and $340,867.90 in 1979, to accurately reflect the income it produced. Also, AEI-*Kansas* earned an additional $13,627.12 in income 1977; AEI-*Nebraska* earned an additional $38,875.67 in income 1978, and an additional $11,236.06 in 1979; and AEI-*Texas* earned an additional $16,304.10 in income in 1979.

The adjustments to AEI-*Iowa*'s income for the tax years 1977, 1978 and 1979 are shown in more detail in exhibit 1–5(a). This exhibit is, in turn, supported by exhibits 1–1 (the Fletchalls' 1977 tax return), 1–1(a), 1–1(b), 1–1(c), 1–6, 1–13, 3–6, 3–8, 3–11, 3–16, 3–28, 3–30, 3–36, 4–3, 4–9, 4–10, 4–31, 4–32, 4–49, 4–74, 4–75, 5–9, 5–19, 5–23, 13–2, 25–1, 25–2, and 25–3 with regard to the additional adjustments to AEI-*Iowa*'s income for 1977. With regard to the additional adjustments to AEI-*Iowa*'s income for 1978, exhibit 1–5(f) is supported by exhibits 1–2 (the Fletchalls' 1978 tax return), 1–2(a), 1–2(b), 1–7, 3–4(b), 3–9, 3–12, 3–14, 3–17, 3–28, 3–36, 4–18, 4–33, 4–51, 4–52, 4–74, 4–81, 13–2, 25–1, 25–2, and 25–3. With regard to the additional adjustments to AEI-*Iowa*'s income for 1979, exhibit 1–5(f) is supported by exhibits 1–3 (the Fletchalls' 1979 tax return), 1–3(a), 1–3(b), 1–8, 3–13, 3–15, 3–18, 3–20, 3–21, 3–28, 3–36, 4–6, 4–7, 4–11, 4–12, 4–13, 4–15, 4–16, 4–34, 4–35, 4–40, 4–53, 4–54, 4–61, 4–67, 4–72, 4–74, 4–75, 5–10, 13–2, 16–1, 17–2, and 25–1.

The adjustments to AEI-*Kansas*'s income for the tax year 1977 are shown in more detail in exhibit 1–5(b). This exhibit is, in turn, supported by exhibits 1–1 (the Fletchalls' 1977 tax return), 1–1(a), 1–1(b), 1–1(c), 1–16, 3–2, 4–9, 9–1, 10–2, 11–2, 12–2, 12–3 and 12–4. The adjustments to AEI-*Nebraska*'s income for the tax years 1978 and 1979 are shown in more detail in exhibit 1–5(c). This exhibit is, in turn, supported by exhibits 1–2 (the Fletchalls' 1978 tax return), 1–2(a), 1–2(b), 1–3 (the Fletchalls' 1979 tax return), 1–3(a), 1–3(b), 1–3(c), 1–7, 1–8, 1–18, 3–2(a), 4–10, 4–41 and 4–42. The adjustments to AEI-*Texas*'s income for the tax year 1979 are shown in more detail in exhibit 1–5(d). This exhibit is, in turn, supported by exhibits 1–3 (the Fletchalls' 1979 tax return), 1–3(a), 1–3(b), 1–3(c), 1–8, 1–19 and 3–2(b).

 Although the Fletchalls offered many arguments and calculations at trial, the Court is not persuaded that any of them did much to contradict the Government's calculations in the above-mentioned exhibits. Some of the Fletchalls' arguments would have had the Court reach the conclusion that the Fletchalls were actually owed a refund from the Government. This was clearly not the case. Other of the Fletchalls' arguments were designed to show minor flaws in the Government's calculations. As the Eighth Circuit stated in *Page*,

> Where a taxpayer's method of accounting does not accurately reflect income, the Commissioner may determine the taxpayer's income under a method which does clearly reflect income .... [W]here the taxpayer files income tax returns which substantially understate income, an assessment of deficiency is necessarily an estimate. As long as the reconstruction method is reasonable and logical, [the taxpayer] may not complain of its inevitable inaccuracies.

*Page*, 58 F.3d at 1347 (citations omitted). The case before this Court was a case where the taxpayers substantially underestimated their income, therefore, it is not enough for the Fletchalls to argue the Government made minor errors in calculating their tax assessment because, in this case, the Government's method of calculating the taxes was unquestionably "reasonable and logical." *Id.*

6. ADDITIONAL AREAS IN WHICH THE FLETCHALLS' 1977–79 TAX RETURNS NEED TO BE ADJUSTED TO REFLECT THEIR ACTUAL INCOME

In addition to the major areas already discussed, there are a number of minor areas in which the Fletchalls' returns need to be adjusted to accurately reflect their actual income during the 1977–79 tax years. The Court will proceed to list each of those adjustments. The Fletchalls omitted $378 in dividend income in 1979. This is supported by exhibit 5–23 at 3, and exhibit 1–3 (the Fletchalls' 1979 tax return). In 1977, 1978, and 1979, respectively, the Fletchalls underreported income they realized from stock sales in the amounts of $3515.25, $4903.67, and $3723.35, respectively. This is supported by exhibits 1–1, 1–2, 1–3 (the Fletchalls' 1977, 1978, and 1979 tax returns, respectively); 3–27; 4–74 and 4–75. The Fletchalls also miscalculated their rental expenses during 1977, 1978, and 1979, by $5572, ($11,376),[4] and $36,739. This is supported by exhibits 1–1, 1–2, 1–3 (the Fletchalls' 1977–79 tax returns); 3–3; 3–23; 3–32; 3–33.

The Fletchalls overstated their miscellaneous expenses during 1979 and thus understated their income by $3204.67. This is supported by exhibits 1–3 (the Fletchalls' 1979 tax return) and 3–35. The Fletchalls also understated itemized deductions during 1978 and 1979 and thereby miscalculated their income owed by $67 and $202, respectively. In 1977, the Fletchalls overstated their itemized deductions and thereby understated their income by $451.[5] These item-

---

4. Figures in parenthesis are ones which the Fletchalls miscalculated to their detriment, therefore these IRS adjustments result in them owing less taxes than they paid previously.

5. In this case, the IRS disallowed an employee business expense deduction of $654, which AEI-

Iowa took in 1977 for the cost of Doris's tuition at Buena Vista College. *See* exhibit 1–1(c) and 1–5(f), line 13. Because AEI–Iowa treated Doris as a contract worker rather than an employee, the $654 was properly taken as an itemized deduction on the Fletchalls' joint return. In addition to the $654 in the Fletchalls' favor on the

ized deductions calculations are supported by exhibits 1–1, 1–2, 1–3 (the Fletchalls' 1977–79 tax returns); and 3–34. AEI–Iowa (hence the Fletchalls) underreported its income by $654 due to an improper business expense deduction in 1977. This is supported by exhibits 1–1(c) and 1–5, line 13. Finally, the Fletchalls took improper depreciation deductions during 1977, 1978, 1979, which, when disallowed, resulted in additional income in the amounts of $2369, $5830, and $11,548, respectively. This is supported by exhibits 1–1, 1–2, 1–3 (the Fletchalls' 1977, 1978, and 1979 tax returns, respectively); and 3–33.

### B. THE FLETCHALLS' 1983 TAX RETURN

■ For the 1983 tax year the Government disallowed an ordinary loss the Fletchalls claimed in connection with the foreclosure of 1000 shares of stock in the First American State Bank of Fort Dodge. First American foreclosed on the stock because the Fletchalls had pledged the stock to the bank as security to guarantee loans the Fletchalls had taken out with the bank. When the Fletchalls did not repay their loans in the agreed upon time, First American foreclosed on the stock. *See* exhibit 25–6 at 6 (First American's notes regarding meetings with Lyle Fletchall). Treasury Regulations § 1.166–9(b) provide that:

[A] payment of principal or interest made during a taxable year beginning after December 31, 1975, by the taxpayer in discharge of part or all of the taxpayer's obligation as a guarantor ... is treated as a worthless nonbusiness dept in the taxable year in which the payment is made .... Neither section 163 nor section 165 shall apply with respect to such payments.

These regulations cover precisely the situation in which the Fletchalls' found themselves. Because the Fletchalls could not claim this foreclosure as an ordinary business loss, the Government made a $25,117 adjustment to the Fletchalls' 1983 tax obligation,

i.e., the Fletchalls owe an additional $25,117 in taxes for 1983.

### C. FRAUD

■ The Fletchalls argue that the IRS tax assessments from the 1977–79 tax years are invalid because 26 U.S.C. § 6501(a) sets a three-year statute of limitations for making a tax assessment.[6] That statute is suspended, however, if the taxpayer files a "false or fraudulent return with the intent to evade the tax," or if there is a "willful attempt in any manner to defeat or evade the tax." If cases of fraud, a tax assessment may be assessed at any time. 26 U.S.C. § 6501(c)(1) and (2).

■ In court, the Commissioner bears the burden of proving fraud by clear and convincing evidence. 26 U.S.C. § 7454(a); Tax Court Rule 142(b). *See also Rechtzigel v. Commissioner*, 703 F.2d 1063, 1064 n. 2 (8th Cir.1983) (per curiam). In a recent discussion of tax fraud, the Eighth Circuit Court of Appeals held,

Fraud has been defined as intentional wrongdoing on the part of the taxpayer, motivated by a specific purpose to evade taxes the taxpayer knows or believes to be owing. *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3rd Cir.1968). Understatement of income, standing alone, will not support a finding of fraud. However, the failure to report one of two sources of profit from the massage parlors resulted in the consistent and substantial understatements at issue in this case. Coupled with the showings that the records were both inaccurate and misleading, and that the appellants attempted to conceal the understated income, this failure to report income is sufficient to uphold the finding of fraud.

*Day v. Commissioner*, 975 F.2d 534, 538–39 (8th Cir.1992).

■ In cases where the IRS alleges the taxpayer has committed fraud, the United

---

itemized deductions portion of their 1977 joint return, the IRS disallowed $203 worth of separate itemized deductions. The total adjustment in the Fletchalls' favor on the itemized deductions portion of their 1977 joint return was $451.

6. The Government concedes the 1977–79 assessments were not made during the three-year time period. The Fletchalls concede the IRS made the 1983 assessments within the three-year statute of limitations.

States Code authorizes a penalty equal to 50% of the underpayment. 26 U.S.C. § 6653(b). This penalty is in addition to the assessed underpayment which the taxpayer must repay. Moreover, the IRS may assess the 50% fraud penalty against the entire amount of the underpayment, even if only part of the underpayment appears to be fraudulent. *Scallen v. Commissioner*, 877 F.2d 1364, 1372 (8th Cir.1989) ("The plain language of § 6653(b) requires that the fraud penalty be imposed if the Commissioner shows that 'any part' of the underpayment of taxes is 'due to fraud.' ").

As the above analysis shows, it is important to determine whether the Fletchalls fraudulently underpaid their taxes in the 1987–89 tax years. If the Court finds no conclusive evidence of fraud, the Fletchalls will not have to pay the assessments from those three years because they will have expired. If the Court finds conclusive evidence of fraud, the Fletchalls will have to pay 100% of the assessments, plus an additional 50% penalty. In *Day*, the Eighth Circuit found that "consistent and substantial understatements" of income coupled with "the showings that the records were both inaccurate and misleading, and that the appellants attempted to conceal the understated income," was sufficient to uphold a conviction for fraud.

■ The Fletchalls' case resembles *Day* in that the Fletchalls consistently and substantially underreported their incomes. As set out above, Doris Fletchall never reported the interest she was earning on her checking account at the First American State Bank of Fort Dodge. Second, Doris Fletchall never reported her income payments from AEI–Iowa. Third, the Fletchalls did not report much of the rental income they received for the various properties they owned. Fourth, the Fletchalls vastly understated their pass-through income from AEI by taking deductions to which they were not entitled. Fifth, the Fletchalls underreported their income by claiming as dependents children they no longer supported. The examples delineated above, also show that the Fletchalls kept inaccurate and misleading records which were designed to conceal the understated income. In short, the Court finds there is overwhelming evidence to persuade it that when the Fletchalls' underpaid their taxes in the 1977, 1978, and 1979, they did so in an attempt to defraud the Government and not simply because they made a mistake calculating how much they owed. For this reason, the Court will suspend 26 U.S.C. § 6501(a)'s three-year statute of limitations on IRS tax adjustments as is allowed by 26 U.S.C. § 6501(c)(1) and (2). Because there was overwhelming evidence of fraud in this case, the Court will impose a 50% fraud penalty pursuant to 26 U.S.C. § 6653(b).

## III. CONCLUSION

Rather than repeating all of the evidence listed above, the Court believes the simplest way to summarize the conclusions it reached above is to reproduce the Government's exhibit 1–5(f) [7] which represented the IRS's adjustments to the Fletchalls' income for the tax years 1977, 1978, and 1979. Though the Court carefully considered all of the Fletchalls' arguments, it is persuaded by the evidence and the case and statutory law that all of the IRS's adjustments were correct. Set out below is a reproduction of exhibit 1–5(f) with an additional row summarizing the total taxes and penalties for each year.

**Adjustments to Taxable Income**

| Category of Adjustments | | 1977 | Years 1978 | 1979 |
|---|---|---|---|---|
| 1. | Interest Income | $ 973.20 | $ 2,630.61 | $ 3,110.95 |
| 2. | Payments to Doris | 15,900.00 | 19,200.00 | 22,242.11 |

7. Exhibit 1–5(f) is a modification of exhibit 1–5. The Court ordered the Government to modify 1–5 because it is unresolved whether the Fletchalls fraudulently transferred certain properties to their daughters Vicki and Valli Jo.

| | Category of Adjustments | | Years | |
|---|---|---|---|---|
| | | 1977 | 1978 | 1979 |
| 3. | Rental Income | 12,320.00 | 15,169.00 | 8,207.00 |
| 4. | AEI–Iowa Income | 276,958.00 | 78,527.77 | 340,867.90 |
| 5. | AEI–Kansas | 13,627.12 | | |
| 6. | AEI–Nebraska | | 38,875.67 | 11,236.06 |
| 7. | AEI–Texas | | | 16,304.10 |
| 8. | Dividend Income | | | 378.00 |
| 9. | Gain on Sale of Stock | 3,515.25 | 4,903.67 | 3,723.35 |
| 10. | Rental Expense | 5,572.00 | (11,376.00) | 36,379.00 |
| 11. | Miscellaneous Income | | | 3,204.67 |
| 12. | Itemized Deductions | (451.00) | 67.00 | 202.00 |
| 13. | Employee Business Expense | 654.00 | | |
| 14. | Depreciation | 2,369.00 | 5,830.00 | 11,548.00 |
| 15. | Exemptions | | | 2,000.00 |
| | Total Adjustments | 331,437.57 | 153,827.72 | 459,763.14 |
| | Additional Taxes Owed | 196,116.42 | 140,291.26 | 335,459.62 |
| | § 6653(b) Penalties Owed | 98,058.21 | 70,145.63 | 167,729.81 |
| | Total Additional Taxes and Penalties | 294,174.63 | 210,436.89 | 503,189.43 |

In addition to the total taxes and penalties owed for 1977–79, the Court is persuaded that the Fletchalls owe an additional $25,117 in taxes from 1983. The Government did not seek § 6653(b) fraud penalties for the 1983 tax year, nor does the Court believe such penalties could have been appropriately awarded. When the total taxes and penalties are added up from 1977, 1978, 1979, and 1983, the grand total is $1,032,917.95, plus statutory interest. The statutory interest rate is set at three percentage points plus the Federal short-term rate for each calendar quarter since the taxes became due. *See* 26 U.S.C. §§ 6621(a)(2)(A) and (B). Each year's taxes became due on April 15 of the year after the tax year was completed, e.g., interest for the 1977 underpayment began accruing on April 15, 1978. *See* 26 U.S.C. § 6601.

**Upon the foregoing,**

**IT IS HEREBY ORDERED** that Lyle and Doris Fletchalls' back taxes due and owing for the years 1977, 1978, 1979, and 1983, are $696,984.30 plus statutory interest. This includes $196,116.42 in 1977; $140,-291.26 in 1978; $335,459.62 in 1979, and $25,-117 in 1983.

**IT IS FURTHER ORDERED** that Lyle and Doris Fletchall owe tax penalties pursuant to 26 U.S.C. § 6653(b) in the amount of $335,933.65 plus statutory interest. This includes $98,058.21 for 1977; $70,145.63 for 1978; and $167,729.81 for 1979. No penalties were incurred for the 1983 tax year.

**IT IS FURTHER ORDERED** that the grand total of back taxes Lyle and Doris Fletchall owe is $1,032,917.95, plus interest as provided by law.